## Mamaux & Son Petition

Before Ellenbogen and Thompson, JJ.

*John E. Laughlin, Jr.*, and *Thorpe, Bostwick, Reed & Armstrong*, for appellant.

*T. McKeen Chidsey*, Attorney General; *M. Louise Rutherford*, Deputy Attorney General; *George L. Reed* and *Charles M. Christler*, for Pennsylvania Labor Relations Board.

THOMPSON, J., November 21, 1947.—Two proceedings by the Pennsylvania Labor Relations Board, in-

volving the partnership of A. Mamaux & Son, were by orders of the Pennsylvania Labor Relations Board made February 3, 1947, ordered to be heard together by the board or its designated agent. One of these proceedings, to wit, the one now filed at no. 1896, January term, 1948, of this court, involves the certification of representatives for the purpose of collective bargaining, and the other proceeding at no. 801, January term, 1948, of this court involves charges of unfair labor practices on the part of defendants. In its order directing a joint hearing the board states: ". . . . both of the said actions, involving the same employer, the same labor organization, employes of the same employer, and similar questions, . . ."

Hearings were accordingly conducted jointly and findings of fact and conclusions of law were made in each case by the board and exceptions filed thereto, and petitions for leave to take further testimony were filed and petitions for judicial review of the final orders of the board are now before us.

While the board has filed separate briefs in the two cases, defendants have filed a single brief covering both cases. In view of the joint consideration of these two cases and of our conclusion that the same question of law rules both of them, this opinion will cover both cases, although a separate order will be made with respect to each and a copy of this opinion filed under each number and term of this court.

The cases have been very ably argued before us, and we have the advantage of very comprehensive briefs, which have been furnished by both parties to these controversies. These briefs cover a rather wide field and display careful consideration and study.

We are, however, met with a question of jurisdiction. Assuming that defendants were engaged in interstate commerce, has the Pennsylvania Labor Relations Board since the enactment of the Federal Labor Relations Act jurisdiction either over the matter of determining

the proper unit for collective bargaining or the question of unfair labor practices by a commercial institution, which is engaged in interstate commerce? We have concluded that this question should be resolved against the Pennsylvania Labor Relations Board. In view of that conclusion we are not permitted, as we view our authority, to discuss or determine the other interesting questions, which as we have stated, are so adequately discussed in the briefs.

The jurisdictional question involves the age-old battleground of the commerce clause and some comment on the commerce clause might, therefore, be appropriate.

### The commerce clause of the Federal Constitution

Tucked away among the powers of Congress enumerated in section 8 of article I of the Federal Constitution is the following rather inconspicuous phrase: "To regulate commerce with foreign nations and among the several states and with the Indian tributaries." The books are filled with cases involving that clause of the Constitution.

One hundred and twenty-four years ago in the leading case of Gibbons v. Ogden, 9 Wheaton 1, involving the navigation of the waters of the State of New York and conferring exclusive rights on Robert Livingston and Robert Fulton for a period of years, in the course of the argument of Daniel Webster the questions raised were:

"(1) Are these laws such as the Legislature of New York had a right to pass? (2) If so, do they . . . interfere with any right enjoyed under the constitution and laws of the United States, and are they, therefore, void, as far as such interference extends? . . .

"In regard to these acts, he should contend, in the first place, that they exceeded the power of the legislature; and, secondly, that if they could be considered valid for any purpose, they were void, still, as against

any right enjoyed under the laws of the United States, with which they came in collision; and that, in this case, they were found interfering with such rights.

"He should contend, that the power of congress to regulate commerce, was complete and entire, and, to a certain extent, necessarily exclusive; that the acts in question were regulations of commerce, in a most important particular; and affecting it in those respects, in which it was under the exclusive authority of congress. . . .

"But, although much had been said, in the discussion on former occasions, about this supposed concurrent power in the states, he found great difficulty in understanding what was meant by it. It was generally qualified, by saying, that it was a power, by which the states could pass laws on the subjects of commercial regulation, which would be valid, until congress should pass other laws controlling them, or inconsistent with them, and that then the state laws must yield. What sort of concurrent powers were these, which could not exist together? Indeed, the very reading of the clause in the constitution must put to flight this notion of a general concurrent power. The constitution was formed for all the states; and congress was to have power to regulate commerce. Now, what is the import of this, but that congress is to give the rule—to establish the system—to exercise the control over the subject? And, can more than one power, in cases of this sort, give the rule, establish the system, or exercise the control? . . .

"This doctrine of a general concurrent power in the states, is insidious and dangerous. If it be admitted, no one can say where it will stop. The states may legislate, it is said, wherever congress has not made a plenary exercise of its power. But who is to judge whether congress has made this plenary exercise of power? Congress has acted on this power; it has done all that it deemed wise; and are the states now to do

whatever congress has left undone? Congress makes such rules as, in its judgment, the case requires; and those rules, whatever they are, constitute the system. All useful regulation does not consist in restraint; and that which congress sees fit to leave free, is a part of its regulation, as much as the rest."

The great chief justice near the close of his opinion, holding that the New York law was unconstitutional, said, inter alia:

"It has been contended by the counsel for the appellant that, as the word 'to regulate' implies in its nature, full power over the thing to be regulated, it excludes, necessarily, the action of all others that would perform the same operation on the same thing. That regulation is designed for the entire result, applying to those parts which remain as they were, as well as to those which are altered. It produces a uniform whole, which is as much disturbed and deranged by changing what the regulating power designs to leave untouched, as that on which it has operated. There is great force in this argument, and the court is not satisfied that it has been refuted."

The question, therefore, of the relative powers of the National Government and the States over interstate commerce was recognized long ago and has been the subject of constant discussion ever since.

Twenty-six years after Gibbons v. Ogden, supra, another case was decided involving the State of Pennsylvania, Cooley v. Board of Wardens, 12 How. 299. That case involved the power of the Board of Wardens of Philadelphia to collect pilotage dues from pilots entering and leaving the Port of Philadelphia. The Supreme Court was divided on this question. In the opinion of the majority of the court, the action of the Pennsylvania Legislature in conferring this authority upon the board of wardens was not an unconstitutional regulation of interstate commerce and the following language was used (p. 320):

"It is the opinion of a majority of the court that the mere grant to Congress of the power to regulate commerce, did not deprive the States of power to regulate pilots, and that although Congress has legislated on this subject, its legislation manifests an intention, with a single exception, not to regulate this subject, but to leave its regulation to the several States. To these precise questions, which are all we are called on to decide, this opinion must be understood to be confined. It does not extend to the question what other subjects, under the commercial power, are within the exclusive control of Congress, or may be regulated by the States in the absence of all congressional legislation; nor to the general question how far any regulation of a subject by Congress, may be deemed to operate as an exclusion of all legislation by the States upon the same subject."

The minority of the court in their opinion stated, inter alia: (p. 324)

"That a state may regulate foreign commerce, or commerce among the States, is a doctrine which has been advanced by individual judges of this court; but never before, I believe, has such a power been sanctioned by the decision of this court. In this case, the power to regulate pilots is admitted to belong to the commercial power of Congress; and yet it is held, that a State, by virtue of its inherent power, may regulate the subject, until such regulation shall be annulled by Congress. This is the principle established by this decision. Its language is guarded, in order to apply the decision only to the case before the court."

It was ultimately determined that the power of Congress over interstate commerce was paramount and that where the subject under regulation was of such a character that uniform regulations must be provided throughout the whole United States that the power of Congress was exclusive even during the silence of Congress (see Leisy v. Hardin, 135 U. S. 100), but that where the subject sought to be regulated was local in

its character the States enjoyed the power of regulation in cases where Congress had been silent and had made no regulation of the subject matter. But, it was further determined that even in matters of essential local character when Congress once undertook to regulate the subject matter its action excluded all regulation by the States. .

### The National Labor Relations Act and its effect

Coming now quite close to the jurisdictional question before us, the National Labor Relations Board was created by an act of Congress, and the power of that board, insofar as it affected the jurisdiction of the States, came before the United States Supreme Court on appeal from the United States Circuit Court of Appeals for the Third Circuit in National Labor Relations Board v. Fainblatt et al., 306 U. S. 601.

Prior to the enactment of the National Labor Relations Act the Supreme Court of the United States had determined in a number of cases that Congress may prohibit wholly intrastate activities, which if permitted would result in restraint of interstate commerce; that it may regulate the activities of a local grain exchange shown to have an injurious effect on interstate commerce; that it may regulate intrastate rates of interstate carriers where the effect of the rates is to burden interstate commerce; that it may compel the adoption of safety appliances on rolling stock moving intrastate because of the relation to and effect of such appliances upon interstate traffic moving over the same railroad; that it may prescribe maximum hours for employes engaged in intrastate activity connected with the movement of any train, such as train dispatchers and telegraphers. (See note to National Labor Relations Board v. Fainblatt, supra, at page 605, where authorities are cited.)

The opinion of Mr. Justice Stone in National Labor Relations Board v. Fainblatt, supra, states:

"This petition raises the question whether the National Labor Relations Act is applicable to employers, not themselves engaged in interstate commerce, who are engaged in a relatively small business of processing materials which are transmitted to them by the owners through the channels of interstate commerce and which after processing are distributed through those channels."

He goes on to state that the National Labor Relations Board had issued its complaint charging respondents with unfair labor practices in violation of certain sections of the National Labor Relations Act. After making a statement as to the nature of the business of defendant company, the opinion continues:

"The Board concluded that respondents' unfair labor practices had led and tended 'to lead to labor disputes burdening and obstructing commerce and the free flow of commerce'. Its order as modified directed respondents to desist from interfering with their employees' right to join a local union and from discouraging membership in the union by discharging them or discriminating against them in the terms of their employment, and it directed respondents to reinstate certain employees who had struck because of the unfair labor practices, some with back pay. . . .

"Only the question of the Board's jurisdiction is raised by the petition and in briefs and argument. It has been settled by repeated decisions of this Court that an employer may be subject to the National Labor Relations Act although not himself engaged in commerce. The end sought in the enactment of the statute was the prevention of the disturbance to interstate commerce consequent upon strikes and labor disputes induced or likely to be induced because of unfair labor practices named in the Act. That those consequences may ensue from strikes of the employees of manufacturers who are not engaged in interstate commerce where the cessation of manufacture necessarily results

in the cessation of the movement of the manufactured product in interstate commerce, has been repeatedly pointed out by this Court: (Cases sited.) Long before the enactment of the National Labor Relations Act it had been many times held by this Court that the power of Congress extends to the protection of interstate commerce from interference or injury due to activities which are wholly intrastate.

"Here interstate commerce was involved in the transportation of the materials to be processed across state lines to the factory of respondents and in the transportation of the finished product to points outside the state for distribution to purchasers and ultimate consumers. . . . Transportation alone across state lines is commerce within the constitutional control of the national government and subject to the regulatory power of Congress. Gibbons v. Ogden, 9 Wheat. 1; Champion v. Ames, 188 U. S. 321.

"Nor do we think it important, as respondents seem to argue, that the volume of the commerce here involved, though substantial, was relatively small as compared with that in the cases arising under the National Labor Relations Act which have hitherto engaged our attention. The power of Congress to regulate interstate commerce is plenary and extends to all such commerce be it great or small. . . . The amount of the commerce regulated is of special significance only to the extent that Congress may be taken to have excluded commerce of small volume from the operation of its regulatory measure by express provision or fair implication.

"The language of the National Labor Relations Act seems to make it plain that Congress has set no restrictions upon the jurisdiction of the Board to be determined or fixed exclusively by reference to the volume of interstate commerce involved. . . . Section 10 (a) confers on the Board authority 'to prevent any person

from engaging in any unfair labor practice (listed in section 8) affecting commerce'.

"The Act on its face thus evidences the intention of Congress to exercise whatever power is constitutionally given to it to regulate commerce by the adoption of measures for the prevention or control of certain specified acts—unfair labor practices—which provoke or tend to provoke strikes or labor disturbances affecting interstate commerce. Given the other needful conditions, commerce may be affected in the same manner and to the same extent in proportion to its volume, whether it be great or small. . . .

"It is no longer open to question that the manufacturer who regularly ships his product in interstate commerce is subject to the authority conferred on the Board with respect to unfair labor practices whenever such practices on his part have led or tend to lead to labor disputes which threaten to obstruct his shipments." (Cases cited.)

It will be noted that the case to which we have just referred deals with the subject of unfair labor practices. The one to which we will next refer deals with the subject of collective bargaining, both of which questions are involved in the proceeding now before us.

The case of Bethlehem Steel Co. et al. v. New York State Labor Relations Board, 330 U. S. 767, which was an appeal from the Court of Appeals of the State of New York, was argued by some members of our own bar, and the majority opinion of the court was written by Mr. Justice Jackson. The opinion begins:

"These appeals challenge the validity of the Labor Relations Act of the State of New York as applied to appellants to permit unionization of their foremen. Conflict is asserted between it and the National Labor Relations Act and hence with the Commerce Clause of the Constitution.

"After enactment by Congress of the National Labor Relations Act, July 5, 1935, 49 Stat. 449, 29 U. S. C.

Sec. 151, et seq., New York adopted a State Labor Relations Act following the Federal pattern."

The opinion then calls attention to the similarities and differences between these two acts and continues:

"The two boards have at times pursued inconsistent policies in applying their respective Acts to petitions of foremen as a class to organize bargaining units thereunder. The State Board has in these cases recognized that right; the National Board for a time recognized it. Union Collieries Coal Co., 41 N. L. R. B. 961; Godchaux Sugars, Inc. 44 N. L. R. B. 874. Later, there was a period when, for policy reasons but without renouncing jurisdiction, it refused to approve foremen organization units. (Cases cited.) Now, again, it supports their right to unionize. (Cases cited.) The foremen of these appellants, at a time when their desire to organize was frustrated by the policy of the National Board, filed applications with the State Board. It entertained their petitions and its policy permitted them as a class to become a bargaining unit. Both employers, by different methods adequate under State Law to raise the question, challenged the constitutionality of the State Act as so applied to them. Their contentions ultimately were considered and rejected by the New York Court of Appeals and its decisions sustaining state power over the matter were brought here by appeals.

"Both of these labor controversies arose in manufacturing plants located in New York where the companies employ large staffs of foremen to supervise a much larger force of labor. But both concerns have such a relation to interstate commerce that, for the reasons stated in National Labor Relations Board v. Jones & Laughlin Steel Corp. 301 U. S. 1, federal power reaches their labor relations. On this basis the National Board has exercised power to certify bargaining agents for units of employees other than foremen of both companies. (Cases cited.) The companies contend

that the National Board's jurisdiction over their labor relations is exclusive of state power; the State contends on the contrary that while Federal power over the subject is paramount, it is not exclusive and in such a case as we have here, until the Federal power is actually exercised as to the particular employees, State power may be exercised.

"At the time the courts of the State of New York were considering this issue, the question whether the Federal Act would authorize or permit unionization of foremen was in controversy and was unsettled until our decision in Packard Motor Car Co. v. N. L. R. B., 330 U. S. 485. Whatever constitutional issue may have been presented by earlier phases of the evolution of the federal policy in relation to that of the State, the question now is whether, Congress having undertaken to deal with the relationship between these companies and their foremen, the State is prevented from doing so. Congress has not seen fit to lay down even the most general of guides to construction of the Act, as it sometimes does, by saying that its regulation either shall or shall not exclude state action. (Authorities cited.) Our question is primarily one of the construction to be put on the Federal Act. It long has been the rule that exclusion of state action may be implied from the nature of the legislation and the subject matter although express declaration of such result is wanting. Napier v. Atlantic Coast Line R. Co., 272 U. S. 605.

"In determining whether exclusion of state power will or will not be implied, we well may consider the respective relation of federal and state power to the general subject matter as illustrated by the case in hand."

Then follows a discussion of the grounds on which an exclusion of State power by Congress may be implied, ending with a citation of National Labor Rela-

tions Board v. Fainblatt, 306 U. S. 601, and continuing:

"In the National Labor Relations Act, Congress has sought to reach some aspects of the employer-employee relation out of which such interferences arise."

The opinion then points out that Congress has sought to reach some aspects of the employer-employee relation and has left outside the scope of its delegation other closely related matters. It then continues:

"When Congress has outlined its policy in rather general and inclusive terms and delegated determination of their specific application to an administrative tribunal, the mere fact of delegation of power to deal with the general matter, without agency action, might preclude any state action if it is clear that Congress has intended no regulation except its own: Oregon-Washington Co. v. Washington, 270 U. S. 87. In other cases, Congress has passed statutes which initiate regulation of certain activities, but where effective regulation must wait upon the issuance of rules by an administrative body. In the interval before those rules are established, this Court has usually held that the police power of the state may be exercised. (Cases cited.) But when federal administration has made comprehensive regulations effectively governing the subject matter of the statute, the Court has said that a state regulation in the field of the statute is invalid even though that particular phase of the subject has not been taken up by the federal agency: Napier v. Atlantic Coast Line·R. Co., 272 U. S. 605."

After further discussion of this point and citation of authorities, the opinion continues:

"The states are in those cases permitted to use their police power in the interval: Terminal Railroad Assn. v. Brotherhood of Railroad Trainmen, 318 U. S. 1. However, the conclusion must be otherwise where failure of the federal officials affirmatively to exercise their full authority takes on the character of a ruling

that no such regulation is appropriate or approved pursuant to the policy of the statute. (Cases cited.)

"It is clear that the failure of the National Labor Relations Board to entertain foremen's petitions was of the latter class. There was no administrative concession that the nature of these appellants' business put their employees beyond reach of federal authority. The Board several times entertained similar proceedings by other employees whose right rested on the same words of Congress. Neither did the National Board ever deny its own jurisdiction over petitions because they were by foremen: Soss Manufacturing Co., 56 N. L. R. B. 348. It made clear that its refusal to designate foremen's bargaining units was a determination and an exercise of its discretion to determine that such units were not appropriate for bargaining purposes: Maryland Drydock Co., 49 N. L. R. B. 733. We cannot, therefore, deal with this as a case where federal power has been delegated but lies dormant and unexercised. . . .

"The National and State Boards have made a commendable effort to avoid conflict in this overlapping state of the statutes. We find nothing in their negotiations, however, which affects either the construction of the federal statute or the question of constitutional power insofar as they are involved in this case, since the National Board made no concession or delegation of power to deal with this subject. The election of the National Board to decline jurisdiction in certain types of cases, for budgetary or other reasons, presents a different problem which we do not now decide.

"We therefore conclude that it is beyond the power of New York State to apply its policy to these appellants as attempted herein. The judgments appealed from are reversed and the causes remanded for further proceedings not inconsistent herewith."

A separate opinion was filed by Mr. Justice Frankfurter in which two other justices of the court joined and in which the concurring justice states:

"If the Court merely held that, having given the National Board jurisdiction over foremen Congress also gave it discretion to determine that it may be undesirable, as a matter of industrial relations, to compel recognition of foremen's unions; that the Board had so exercised its discretion and, by refusing to sanction foremen's unions, had determined that foremen in enterprises like those before us could not exact union recognition; that therefore New York could not oppose such federal action by a contrary policy of its own, I should concur in the Court's decision, whatever the differences of interpretation to which the course of events before the National Board may lend itself. But the Court's opinion does not, as I read it, have that restricted scope, based on the individual circumstances before us. Apart from the suggestion that the National Board's declination of jurisdiction 'in certain types of cases, for budgetary or other reasons' might leave room for the State in those situations, the Court's opinion carries at least overtones of meaning that, regardless of the consent of the National Board, New York is excluded from enforcing rights of collective bargaining in all industries within its borders as to which Congress has granted opportunity to invoke the authority of the National Board."

Later on in the concurring opinion there is an appendix in which correspondence between the New York Labor Relations Board and the National Labor Relations Board is included in which it appears that a modus operandi had been reached between the two boards in which it had been mutually agreed that certain labor relations matters should be left to the determination of the New York Labor Relations Board, such as:

"1. Retail stores,

"2. Small industries which receive all or practically all raw materials from within the State of New York, and do not ship any material proportion of their product outside the State,

"3. Service trades (such as laundries),

"4. Office and residential buildings,

"5. Small and clearly local public utilities, (This includes local traction companies, as well as gas and electric light corporations.)

"6. Storage warehouses,

"7. Construction operations,

"8. Other obviously local businesses."

The problems involved in National Labor Relations Board v. Fainblatt, supra, and Bethlehem Steel Company v. New York State Labor Relations Board, supra, finally reached our own Pennsylvania Supreme Court in Pittsburgh Railways Company Substation Operators and Maintenance Employees' Case, 357 Pa. 379. The opinion of Mr. Justice Patterson begins with:

"These appeals challenge the propriety of the Pennsylvania Labor Relations Board's interpretation and application of Section 7 of the Act of 1937, P. L. 1168, as amended by the Act of 1945, P. L. 1379, 43 P. S. Section 211.7, and its jurisdiction to entertain a petition to determine the appropriate unit for the purpose of collective bargaining.

"The International Union of Operating Engineers, Local No. 95, a labor organization, on July 11, 1944, filed a petition with the Pennsylvania Labor Relations Board asserting that a question concerning representation of employees had arisen in a suggested unit comprising substation operators and maintenance mechanics of the Pittsburgh Railways Company; that the Company refused to bargain with Local No. 95 unless certified as the bargaining representative; and, prayed for an investigation of the controversy and certification of the representative designated or selected by a majority of the employees in a unit appropriate for such purposes."

The opinion then refers to subsequent proceedings, which reached the Common Pleas Court of Allegheny County on appeal, and resulted in an affirmance of

the Pennsylvania Labor Relations Board. The opinion continues:

"These appeals followed. Because of the possible effect of the decision of the Supreme Court of the United States in Bethlehem Steel Company v. New York State Labor Relations Board and Allegheny Ludlum Steel Corporation v. Kelley, 330 U. S. 767, 67 Sup. Ct. 1026, upon the question of jurisdiction in the present case, reargument was ordered.

"Pittsburgh Railways is admittedly engaged in interstate commerce within the meaning of the National Labor Relations Act: . . . Its operations have a substantial effect upon interstate commerce. Employer-employee relations with regard to the selection and determination of an appropriate bargaining unit, certification of a representative for purposes of collective bargaining and prevention of unfair labor practices are within the jurisdiction of the National Board.

"Appellants contend that the Pennsylvania Labor Relations Board could not constitutionally entertain the petition for investigation and certification for the reason that Congress, by enactment of the National Labor Relations Act, had foreclosed state action. The Pennsylvania Labor Relations Board, appellee, contends that although an industry is engaged in interstate commerce within the meaning of the National Labor Relations Act, jurisdiction to determine appropriate bargaining units and certify collective bargaining representatives does not vest exclusively in the National Labor Relations Board but is concurrent, and that the exercise of state power can be suspended only when the issue presented has been before the National Board or where the state board enforces a policy at variance with or repugnant to that of the National Labor Relations Board. This latter contention cannot be sustained.

"The power of a state to regulate a given subject may be suspended if Congress deems it necessary and

advisable, and by a proper exercise of a delegated power does enact legislation with regard thereto. Prior to enactment of the National Labor Relations Act, power of the states to regulate all phases of employer-employee relations, as regards collective bargaining, was unrestrained by Congressional action, notwith-standing that the industries affected were engaged wholly in interstate commerce or in the manufacture or production of goods destined to be shipped in inter-state commerce. Congressional power to regulate inter-state commerce did not in any manner impair adminis-tration of state laws; nor had Congressional silence been construed as restricting exercise of state power. When Congress, for the purpose of eliminating burdens upon the free flow of commerce between the states, struck at abuses prevalent among industries engaged in the production of goods for interstate commerce and enacted the National Labor Relations Act, it secured to all employees encompassed within the orbit of its power the right of collective bargaining through rep-resentatives of their own choosing and restrained em-ployers from committing certain designated unfair labor practices."

The court then goes on to discuss the creation of the National Labor Relations Board and refers to National Labor Relations Board v. Fainblatt, supra, and con-tinues:

"The subject matter of the instant dispute does not constitute or represent 'a separable or distinct seg-ment of the matter covered by the federal statute'. Nor can it be said that 'the federal agency has not acted on that segment'. See Bethlehem Steel Company v. New York State Labor Relations Board, supra, 67 Sup. Ct. at 1030. The issue—determination of the col-lective bargaining unit and collective bargaining agent—represents a basic and fundamental part of the Congressional regulation. Congress, having exercised

its power, did not intend to permit state action with regard thereto."

Then follows a reference to the Bethlehem Steel case and a quotation from the opinion of Mr. Justice Jackson. The court then continues:

"Appellant further contends that it may act until the National Board has acted in the same case. The Supreme Court, dismissing an identical contention in the Bethlehem Steel case, supra (67 Sup. Ct. at 1031), said: '. . . we do not think that a case by case test of federal supremacy is permissible here.' Determination of permissible exercise of state power in circumstances presented depends not upon possible inconsistent state action but upon the affirmative exercise of power by Congress. A state may not be permitted to exercise powers dependent upon consistency or inconsistency with federal policy. Congress has exercised its power over the identical relationship and properly vested jurisdiction for determination and regulation thereof in an administrative agency created by it for that purpose. . . . The clear implication of the decision of the Supreme Court of the United States in Bethlehem Steel Co. et al. v. New York State Labor Relations Board, supra, is that wherever the employer-employee relationship is one over which Congress has the power of regulation and with regard to which Congress has acted, state power is suspended and cannot constitutionally be exercised. To permit the exercise of state power in such circumstances would effectively negative the supremacy of Congressional legislation.

"The criterion to determine validity of the exercise of state power is not whether the agency administering federal law has acted upon the relationship in a given case; rather, it is whether Congress has asserted its power to regulate that relationship. The Pennsylvania Labor Relations Board could not constitutionally entertain the petition for determination of the bargaining agent. In so doing, it was acting upon subject matter,

regarding which Congress had asserted its power of regulation and jurisdiction over which had properly been delegated to the National Labor Relations Board."

We have quoted at great length from three court opinions, two of the Supreme Court of the United States and one recently by our own Supreme Court because it is contended by the Pennsylvania Labor Relations Board that it still has jurisdiction over controversies such as now before us, notwithstanding these decisions.

In the two cases now before us, the Pennsylvania Labor Relations Board made identical findings of fact bearing the same number as follows:

"4. . . . That respondents are engaged in the business of manufacturing awnings and canvas products, and in the sale of canvas products, canvas and venetian blinds in the tri-State area of Pennsylvania, Ohio and West Virginia and in connection therewith, operate plants consisting of two buildings with three floors in each building located at No. 120 Boulevard of the Allies, Pittsburgh, Pa."

In the petition for enforcement of its order in the proceeding now before us at no. 801, January term, 1948, the board sets forth in paragraph 2 of its petition the following:

"2. . . . That A. Mamaux and Son, respondent, is engaged in the business of manufacturing awnings and canvas products and in the sale of canvas products, canvas and venetian blinds in the tri-State area of Pennsylvania, Ohio and West Virginia with principal offices located at 120 Boulevard of the Allies, Pittsburgh, Pa."

It, therefore, appears in the board's own findings of fact and the statement of its own petition that defendants are engaged in interstate commerce, but the board in its brief filed at no. 801, January term, 1948, has stated in language, a part of which has been italicized by them, and which we will likewise italicize, the following:

"In Ex. 1, which is to be found on page 8 of the petition for review, there is an allegation that since employer is engaged in interstate commerce, the board has no jurisdiction over employer or its relation with its employes. To the contrary, however, courts have repeatedly held that *the Pennsylvania Labor Relations Board may enforce the State statute until its jurisdiction is ousted by the exercise of jurisdiction by the National Labor Relations Board, by virtue of Federal authority of the identical labor dispute over which the Pennsylvania Labor Relations Board has assumed jurisdiction:* (Cases cited.)

"*The Act of May 27, 1943, P. L. 741, 43 PS §211.3 (pocket part), which by its title amended section 3 (c) of the act by 'including persons subject to the National Labor Relations Act in the definition of "employer" ', granted the Pennsylvania Labor Relations Board concurrent jurisdiction with the National Board:* York Telephone and Telegraph Company Employes Case, 55 D. & C. 113, 118 (1945). This was the determination of your honorable court in Petition of Equitable Gas Co., 51 D. & C. 653, 659, 660 (1944), wherein it was said by his honor, Judge Richardson, that: (Italics supplied.)

" '. . . Assuming the propriety of the exercise of authority by the National board over a labor dispute affecting interstate commerce, that board's authority would be paramount, and the State board's jurisdiction over the same dispute would be ousted. *In the present case, however, there is no clash between Federal and State authority. The National board has not acted. The Legislature of Pennsylvania has conferred on the board jurisdiction over persons subject to the National Labor Relations Act. Our question is whether the legislature has the power to confer such jurisdiction upon the board.*

" 'A reading of the authorities which deal with the question leads to the conclusion that *the passage of the*

*National Labor Relations Act did not ipso facto preclude State legislation applicable to the same situations, and that the State labor relations boards can act under such legislation until such time as they are ousted by the exercise of jurisdiction by the National Labor Relations Board under the National act. . . .'*

"The law has not been changed by the decision of the Supreme Court of the United States in Bethlehem Steel Company v. New York State Labor Relations Board, 330 U. S. 767, 67 S. Ct. 1026 (1947) and the decision of the Supreme Court of Pennsylvania in Pittsburgh Railways Company Substation Operators and Maintenance Employees' Case, 357 Pa. 379 (1947), as alleged in paragraph 14 of the petition for review."

We are unable to agree with the distinguished counsel for the Pennsylvania Labor Relations Board in the conclusions reached by them on the question of jurisdiction and, on the contrary, if we correctly understand the opinions to which reference has been made, the courts have now reached a point where until further action by Congress the jurisdiction of the Pennsylvania Labor Relations Board cannot be exerted to grant relief in the cases now before us.

It seems to us that the Pennsylvania Labor Relations Board and also some of the courts, including our own, and courts in other jurisdictions, which have reached conclusions in support of the views entertained by the Pennsylvania Labor Relations Board, have apparently had their minds centered on the activities of the National Labor Relations Board rather than on the act of Congress creating that board, and that the question of jurisdiction must now be largely measured by what Congress said in the National Labor Relations Act rather than what the National Labor Relations Board has done or has not done in executing that act.

The act, as the United States Supreme Court has pointed out, grants authority not only over collective bargaining but over unfair conduct in labor relations.

It appears, however, from the briefs of counsel and from the record in these cases that quite early in the hearing before the board the counsel for defendants stated that they did not propose to raise the question of jurisdiction, and the board, therefore, holds that even if its jurisdiction was questionable that point has been expressly waived by defendants. Waiver of jurisdiction, as we understand it, may be made where the jurisdiction merely relates to the parties and this arises oftentimes on the question of service. But, where the question of jurisdiction relates to the subject matter in dispute, it is fundamental and jurisdiction cannot be waived, nor can it be created by consent of the parties. As a rule, the lack of jurisdiction may be raised at any state of the proceedings. We, therefore, hold that the waiver by counsel for defendants was ineffective to foreclose the raising of this question.

Counsel for defendants contend that the reason for the expressed waiver of the question of jurisdiction had been the practice of the Labor Relations Board to deal with questions involving interstate commerce, unless the National Labor Relations Board had already taken action with respect to the same matter. It is clear from the record before us that this was the understanding and practice of all concerned.

It is also equally clear from a reading of the whole record that the findings of fact by the board, which we have quoted above, which seem to determine that defendant company was engaged in interstate commerce, were made rather casually and without being regarded either by the State Labor Relations Board or by defendants at the time as being material. It, therefore, seems to us to be unwise to have this important question of jurisdiction determined without all the available evidence relating to the nature of defendants' business from an interstate standpoint being presented.

A petition was filed before the board by defendants seeking to introduce further testimony regarding the interstate character of the business of defendants. In the petition for review of the final order of the board filed by defendants at no. 1896, January term 1948, paragraph 19 reads as follows:

"19. . . . . Petitioner is prepared to prove that nearly 100 percent of the raw materials used in its business are purchased through New York mill agents and are manufactured in North and South Carolina, Georgia, Alabama, Texas and Ohio and are shipped from these States to Pittsburgh, Pa., by railroad; that after receipt of the said raw materials in Pittsburgh and their manufacture, they are resold at wholesale and retail both in Pennsylvania and outside Pennsylvania, and particularly in Ohio and West Virginia, and that certain of petitioner's merchandise is sold all over the United States; and that both in the past when it maintained an erection department, and at the present time when erection of awnings is done for petitioner by independent contractors, a substantial portion of this awning erection was and is performed outside the State of Pennsylvania."

If defendants are able to prove these averments, there would be no doubt whatever as to the interstate character of this business.

We think, therefore, that before the proceedings in this case before the Pennsylvania Labor Relations Board are entirely completed, an opportunity should be afforded to defendants to present the evidence, which they outline in paragraph 19 of their petition for review.

*Order of court*

And now, after consideration of the petition for review of the order of the Pennsylvania Labor Relations Board filed by defendants in the proceedings at no. 1896, January term, 1948, and no. 801, January term, 1948, and after oral argument and considera-

tion of briefs of counsel, it is ordered, adjudged and decreed that as the record now stands the Pennsylvania Labor Relations Board is without jurisdiction to entertain the above-entitled proceeding, and any further action in the nature of relief by said board is now stayed until further order of this court, and the case is referred back to the Pennsylvania Labor Relations Board for the purpose of taking additional testimony bearing on the contention that defendants are engaged in interstate commerce as that term is understood in the National Labor Relations Act.