NATIONAL LABOR RELATIONS BOARD *v.* FAIN-
BLATT ET AL.

No. 514.   Argued March 8, 9, 1939.—Decided April 17, 1939.

Mr. *Charles Fahy*, with whom *Solicitor General Jackson*, and *Messrs. Charles A. Horsky, Robert B. Watts, Laurence A. Knapp*, and *Mortimer B. Wolf* were on the brief, for petitioner.

Mr. *T. Girard Wharton*, with whom *Messrs. Leon Gerofsky* and *Joseph Halpern* were on the brief, for respondents.

MR. JUSTICE STONE delivered the opinion of the Court.

This petition raises the question whether the National Labor Relations Act is applicable to employers, not themselves engaged in interstate commerce, who are engaged in a relatively small business of processing materials which are transmitted to them by the owners through the channels of interstate commerce and which after processing are distributed through those channels.

Pursuant to § 10 (b) of the National Labor Relations Act, c. 372, 49 Stat. 449; 29 U. S. C. § 151 *et seq.*, the National Labor Relations Board issued its complaint charging respondents with unfair labor practices in violation of § 8 (1), (3), (5) and § 2 (6), (7) of the Act. After a hearing, which resulted in a decision and order of the Board, a supplemental hearing was held pursuant to order of the Court of Appeals for the Third Circuit, which resulted in a supplemental decision and an order reaffirming the Board's original findings and conclusions of law and modifying the original order in one respect not now material.

The facts, as found by the Board, are that respondents, under the name of Somerset Manufacturing Company, are engaged at Somerville, New Jersey, in the business of processing materials into various types of women's sports garments. They operate what is known as a "contract shop." The materials are supplied by and are the property of the Lee Sportswear Company, a partnership

located in New York City. The cloth from which the garments are made is usually cut by the Lee Sportswear Company in New York City and then shipped by truck to respondents' factory in New Jersey. Sometimes the raw materials are shipped, on the order of the Lee Sportswear Company, directly from the mills manufacturing them, many of which are outside of New Jersey. All the materials are manufactured at respondents' New Jersey factory under contract. The finished garments are there delivered to a representative of the Lee Sportswear Company, who ships them to the company in New York City or directly to its customers throughout the United States.

Throughout the year there is normally a continuous day-by-day flow of shipments of raw materials to respondents' factory from points without the state, and of finished garments from respondents' plant to New York City and other points outside of New Jersey. During the years 1934 and 1935 respondents appear to have finished more than a thousand dozen garments each month. In the course of the supplemental hearing in 1937 it appeared that respondents had increased their working force from sixty to approximately two hundred employees, from which the Board inferred a corresponding increase of output. Immediately preceding a strike of thirty-four of the workers in respondents' tailoring department, which occurred in September, 1935, and which the Board found to be induced by the unfair labor practices of respondents, shipments were about 80 per cent. of those for the corresponding period in 1934. Following the strike, output decreased by more than one-half, or to 38 per cent. of the shipments for the corresponding period in 1934.

The Board concluded that respondents' unfair labor practices had led and tended "to lead to labor disputes burdening and obstructing commerce and the free flow of commerce." Its order as modified directed respondents to desist from interfering with their employees' right to

join a local union and from discouraging membership in the union by discharging them or discriminating against them in the terms of their employment, and it directed respondents to reinstate certain employees who had struck because of the unfair labor practices, some with back pay.

The Board's petition for enforcement of its order was denied by the Court of Appeals for the Third Circuit, 98 F. 2d 615, on the ground that respondents were not themselves engaged in interstate commerce and had no title or interest in the raw materials or finished products which moved to and from respondents' factory in New Jersey from and to points outside the state. We granted certiorari January 9, 1939, the question being one of public importance in the administration of the National Labor Relations Act.

Only the question of the Board's jurisdiction is raised by the petition and in briefs and argument. It has been settled by repeated decisions of this Court that an employer may be subject to the National Labor Relations Act although not himself engaged in commerce. The end sought in the enactment of the statute was the prevention of the disturbance to interstate commerce consequent upon strikes and labor disputes induced or likely to be induced because of unfair labor practices named in the Act. That those consequences may ensue from strikes of the employees of manufacturers who are not engaged in interstate commerce where the cessation of manufacture necessarily results in the cessation of the movement of the manufactured product in interstate commerce, has been repeatedly pointed out by this Court. *National Labor Relations Board* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1, 38–40; *National Labor Relations Board* v. *Fruehauf Trailer Co.*, 301 U. S. 49; *National Labor Relations Board* v. *Friedman-Harry Marks Clothing Co.*, 301 U. S. 58; *Santa Cruz Packing Co.* v. *National Labor Relations Board*, 303 U. S. 453, 463 *et seq.;* cf. *Consolidated*

*Edison Co.* v., *National Labor Relations Board,* 305 U. S. 197. Long before the enactment of the National Labor Relations Act it had been many times held by this Court that the power of Congress extends to the protection of interstate commerce from interference or injury due to activities which are wholly intrastate.[1]

Here interstate commerce was involved in the transportation of the materials to be processed across state lines to the factory of respondents and in the transportation of the finished product to points outside the state for distribution to purchasers and ultimate consumers. Whether shipments were made directly to respondents, as the Board found, or to a representative of Lee Sportswear Company at the factory, as respondents contend, is immaterial. It was not any the less interstate commerce because the transportation did not begin or end with the transfer of title of the merchandise transported. See *Santa Cruz Packing Co.* v. *National Labor Relations Board,* supra, 463; cf. *Gloucester Ferry Co.* v. *Pennsyl-*

---

[1] It may prohibit wholly intrastate activities which, if permitted, would result in restraint of interstate commerce. *Coronado Coal Co.* v. *United Mine Workers,* 268 U. S. 295, 310; *Bedford Cut Stone Co.* v. *Stone Cutters Assn.,* 274 U. S. 37, 46; *Local 167* v. *United States,* 291 U. S. 293, 297. It may regulate the activities of a local grain exchange shown to have an injurious effect on interstate commerce. *Chicago Board of Trade* v. *Olsen,* 262 U. S. 1. It may regulate intrastate rates of interstate carriers where the effect of the rates is to burden interstate commerce. *Houston, E. & W. Texas Ry. Co.* v. *United States,* 234 U. S. 342; *Railroad Commission of Wisconsin* v. *Chicago, B. & Q. R. Co.,* 257 U. S. 563; *United States* v. *Louisiana,* 290 U. S. 70, 74; *Florida* v. *United States,* 295 U. S. 301. It may compel the adoption of safety appliances on rolling stock moving intrastate because of the relation to and effect of such appliances upon interstate traffic moving over the same railroad. *Southern Ry. Co.* v. *United States,* 222 U. S. 20. It may prescribe maximum hours for employees engaged in intrastate activity connected with the movement of any train, such as train dispatchers and telegraphers. *Baltimore & Ohio R. Co.* v. *Interstate Commerce Comm'n,* 221 U. S. 612, 619.

*vania,* 114 U. S. 196, 203; *Wabash, St. L. & P. Ry. Co.* v. *Illinois,* 118 U. S. 557; *Hanley* v. *Kansas City Southern Ry. Co.,* 187 U. S. 617, 619; *Morf* v. *Bingaman,* 298 U. S. 407; *Ingels* v. *Morf,* 300 U. S. 290. Transportation alone across state lines is commerce within the constitutional control of the national government and subject to the regulatory power of Congress. *Gibbons* v. *Ogden,* 9 Wheat. 1; *Champion* v. *Ames,* 188 U. S. 321.

Nor do we think it important, as respondents seem to argue, that the volume of the commerce here involved, though substantial, was relatively small as compared with that in the cases arising under the National Labor Relations Act which have hitherto engaged our attention. The power of Congress to regulate interstate commerce is plenary and extends to all such commerce be it great or small. *Hanley* v. *Kansas City Southern Ry. Co., supra.* The exercise of Congressional power under the Sherman Act, the Clayton Act, the Federal Trade Commission Act, or the National Motor Vehicle Theft Act, has never been thought to be constitutionally restricted because in any particular case the volume of the commerce affected may be small. The amount of the commerce regulated is of special significance only to the extent that Congress may be taken to have excluded commerce of small volume from the operation of its regulatory measure by express provision or fair implication.

The language of the National Labor Relations Act seems to make it plain that Congress has set no restrictions upon the jurisdiction of the Board to be determined or fixed exclusively by reference to the volume of interstate commerce involved. Section 2 (6) defines commerce as "trade, traffic, commerce, transportation, or communication among the several States," without reference to its volume, and declares in subsection (7) that "The term 'affecting commerce' means in commerce, or burdening or obstructing commerce or the free flow of commerce, or

having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce." Section 10 (a) confers on the Board authority "to prevent any person from engaging in any unfair labor practice (listed in section 8) affecting commerce."

The Act on its face thus evidences the intention of Congress to exercise whatever power is constitutionally given to it to regulate commerce by the adoption of measures for the prevention or control of certain specified acts—unfair labor practices—which provoke or tend to provoke strikes or labor disturbances affecting interstate commerce. Given the other needful conditions, commerce may be affected in the same manner and to the same extent in proportion to its volume, whether it be great or small. Examining the Act in the light of its purpose and of the circumstances in which it must be applied we can perceive no basis for inferring any intention of Congress to make the operation of the Act depend on any particular volume of commerce affected more than that to which courts would apply the maxim *de minimis*.

There are not a few industries in the United States which, though conducted by relatively small units, contribute in the aggregate a vast volume of interstate commerce.[2] Some, like the clothing industry, are extensively unionized and have had a long and tragic history of industrial strife. It is not to be supposed that Congress, in its attempted nationwide regulation of interstate commerce through the removal of the causes of industrial

---

[2] In the year 1933 the women's clothing industry ranked ninth among manufacturing industries in number of workers employed and eighth in value of product. U. S. Biennial Census of Manufactures (Commerce Dept., 1933). In this industry the "contract shop" is common. About one-half of the 3,414 enterprises engaged in 1935 in the manufacture of women's dresses were "contract shops." U. S. Biennial Census of Manufactures (Commerce Dept., 1935). These enterprises employed an average of only about thirty-two employees each.

strife affecting it, intended to exclude such industries from the sweep of the Act. In this, as in every other case, the test of the Board's jurisdiction is not the volume of the interstate commerce which may be affected, but the existence of a relationship of the employer and his employees to the commerce such that, to paraphrase § 10 (a) in the light of constitutional limitations, unfair labor practices have led or tended to lead "to a labor dispute burdening or obstructing commerce."

It is no longer open to question that the manufacturer who regularly ships his product in interstate commerce is subject to the authority conferred on the Board with respect to unfair labor practices whenever such practices on his part have led or tend to lead to labor disputes which threaten to obstruct his shipments. *National Labor Relations Board* v. *Jones & Laughlin Steel Corp., supra; National Labor Relations Board* v. *Fruehauf Trailer Co., supra; National Labor Relations Board* v. *Friedman-Harry Marks Clothing Co., supra; Santa Cruz Packing Co.* v. *National Labor Relations Board, supra; Consolidated Edison Co.* v. *National Labor Relations Board, supra.* We cannot say, other things being equal, that the tendency differs in kind, quantity or effect merely because the merchandise which the manufacturer ships, instead of being his own, is that of the consignee or his customers in other states. In either case commerce is in danger of being obstructed in the same way and to the same extent.

Here, although respondents' manufacturing business is small, employing from sixty to two hundred employees, its product is regularly shipped in interstate commerce. The Board's finding that respondents' unfair labor practices have led and tend to lead to labor disputes burdening interstate commerce and interfering with its free flow is supported by the evidence. Moreover, the Board has found specifically that respondents' unfair labor practices in attempting to prevent the unionization of their factory

did in fact lead to a strike in respondents' tailoring establishment, with a consequent reduction of about 50 per cent. in respondents' output. These findings are not challenged.

The threatened consequences to interstate commerce are as immediate and as certain to flow from respondents' unfair labor practices as were those which were held to result from unfair labor practices in *National Labor Relations Board* v. *Jones & Laughlin Steel Corp., supra; National Labor Relations Board* v. *Fruehauf Trailer Co., supra; National Labor Relations Board* v. *Friedman-Harry Marks Clothing Co., supra; Santa Cruz Packing Co.* v. *National Labor Relations Board, supra; Consolidated Edison Co.* v. *National Labor Relations Board, supra.* That the volume of commerce affected is smaller than in other cases in which the jurisdiction of the Board has been upheld, for reasons already stated, is in itself without significance.

*Reversed.*

MR. JUSTICE MCREYNOLDS, dissenting:

MR. JUSTICE BUTLER and I conclude that the challenged judgment should be affirmed.

Respondent, Benjamin Fainblatt, as sole owner, conducts a small plant for manufacturing wearing apparel located at Somerville, New Jersey, where he employs some sixty women. There he receives material belonging to Lee Sportswear Company of New York and under contract converts this into garments. These are delivered to the company's representative and payment is made for the work done. The owner sends the finished products to New York.

The Labor Board claims jurisdiction in respect of employment at this establishment upon the theory that the material and garments move in interstate commerce;

that disapproved labor practices there may lead to disputes; that these may cause a strike; that this may reduce the factory output; that because of such reduction less goods may move across the state lines; and thus there may come about interference with the free flow of commerce between the states which Congress has power to regulate. So, it is said, to prevent this possible result Congress may control the relationship between the employer and those employed. Also, that the size of the establishment's normal output is of minor or no importance. If the plant presently employed only one woman who stitched one skirt during each week which the owner regularly accepted and sent to another state, Congressional power would extend to the enterprise, according to the logic of the Court's opinion.

Manifestly if such attenuated reasoning—possibility massed upon possibility—suffices, Congress may regulate wages, hours, output, prices, etc., whenever any product of employed labor is intended to pass beyond state lines—possibly if consumed next door. Producers of potatoes in Maine, peanuts in Virginia, cotton in Georgia, minerals in Colorado, wheat in Dakota, oranges in California, and thousands of small local enterprises become subject to national direction through a Board.

Of course, no such result was intended by those who framed the Constitution. If the possibility of this had been declared the Constitution could not have been adopted. So construed, the power to regulate interstate commerce brings within the ambit of federal control most if not all activities of the Nation; subjects states to the will of Congress; and permits disruption of our federated system.

*Kidd* v. *Pearson* (1888) 128 U. S. 1, 20, 21, lucidly pointed out the necessary result of this subversive doctrine, showed how it had long been authoritatively rejected, and demonstrated its utter absurdity. A few

paragraphs from that opinion may quicken estimation of what now impends.

"We think the construction contended for by plaintiff in error would extend the words of the grant to Congress, in the Constitution, beyond their obvious import, and is inconsistent with its objects and scope. The language of the grant is, 'Congress shall have power to regulate commerce with foreign nations and among the several States,' etc. These words are used without any veiled or obscure signification. 'As men whose intentions require no concealment generally employ the words which most directly and aptly express the ideas they intend to convey, the enlightened patriots who framed our Constitution, and the people who adopted it, must be understood to have employed words in their natural sense and to have intended what they have said.' *Gibbons* v. *Ogden, supra,* at page 188 [9 Wheat. 1, 188].

"No distinction is more popular to the common mind, or more clearly expressed in economic and political literature, than that between manufactures and commerce. Manufacture is transformation—the fashioning of raw materials into a change of form for use. The functions of commerce are different. The buying and selling and the transportation incidental thereto constitute commerce; and the regulation of commerce in the constitutional sense embraces the regulation at least of such transportation. The legal definition of the term, as given by this court in *County of Mobile* v. *Kimball,* 102 U. S. 691, 702, is as follows: 'Commerce with foreign countries, and among the States, strictly considered, consists in intercourse and traffic, including in these terms navigation, and the transportation and transit of persons and property, as well as the purchase, sale, and exchange of commodities.' If it be held that the term includes the regulation of all such manufactures as are intended to be the subject of commercial transactions in the future, it is impossible to deny

that it would also include all productive industries that contemplate the same thing. The result would be that Congress would be invested, to the exclusion of the States, with the power to regulate, not only manufactures, but also agriculture, horticulture, stock raising, domestic fisheries, mining—in short, every branch of human industry. For is there one of them that does not contemplate, more or less clearly, an interstate or foreign market? Does not the wheat grower of the Northwest, and the cotton planter of the South, plant, cultivate, and harvest his crop with an eye on the prices at Liverpool, New York, and Chicago? The power being vested in Congress and denied to the States, it would follow as an inevitable result that the duty would devolve on Congress to regulate all of these delicate, multiform, and vital interests—interests which in their nature are and must be, local in all the details of their successful management."

The doctrine approved in *Kidd* v. *Pearson* has been often applied. It was the recognized view of this Court for more than a hundred years:

*United States* v. *E. C. Knight Co.,* (1895) 156 U. S. 1, 16 declared—

"Slight reflection will show that if the national power extends to all . . . productive industries, whose ultimate result may affect external commerce, comparatively little of business operations and affairs would be left for state control."

*Oliver Iron Co.* v. *Lord,* (1923) 262 U. S. 172, 178—

"Mining is not interstate commerce, but, like manufacturing, is a local business subject to local regulation and taxation. . . . Its character in this regard is intrinsic, is not affected by the intended use or disposal of the product, is not controlled by contractual engagements, and persists even though the business be conducted in close connection with interstate commerce."

*Schechter Corp.* v. *United States,* (1935) 295 U. S. 495, 546, 548, 549, 550—

"If the commerce clause were construed to reach all enterprises and transactions which could be said to have an indirect effect upon interstate commerce, the federal authority would embrace practically all the activities of the people and the authority of the State over its domestic concerns would exist only by sufferance of the federal government. . . . The distinction between direct and indirect effects of intrastate transactions upon interstate commerce must be recognized as a fundamental one, essential to the maintenance of our constitutional system. . . . If the federal government may determine the wages and hours of employees in the internal commerce of a State . . . it would seem that a similar control might be exerted over other elements of cost, also affecting prices, such as the number of employees, rents, advertising, methods of doing business, etc. All the processes of production and distribution that enter into cost could likewise be controlled. . . . But the authority of the federal government may not be pushed to such an extreme as to destroy the distinction, which the commerce clause itself establishes, between commerce 'among the several States' and the internal concerns of a State. . . . The recuperative efforts of the federal government must be made in a manner consistent with the authority granted by the Constitution."

*Carter* v. *Carter Coal Co.*, (1936) 298 U. S. 238, 303, 309—

"Plainly, the incidents leading up to and culminating in the mining of coal do not constitute such intercourse. The employment of men, the fixing of their wages, hours of labor and working conditions, the bargaining in respect of these things—whether carried on separately or collectively—each and all constitute intercourse for the purposes of production, not of trade. . . . The government's contentions in defense of the labor provisions are really disposed of adversely by our decision in the

*Schechter* case. . . . There is no basis in law or reason for applying different rules to the two situations."

The present decision and the reasoning offered to support it will inevitably intensify bewilderment. The resulting curtailment of the independence reserved to the states and the tremendous enlargement of federal power denote the serious impairment of the very foundation of our federated system. Perhaps the change of direction, no longer capable of concealment, will give potency to the efforts of those who apparently hope to end a system of government found inhospitable to their ultimate designs.