**NATIONAL LABOR RELATIONS BOARD v. MID-CO GASOLINE CO.**

No. 12522.

United States Court of Appeals
Fifth Circuit.

Feb. 16, 1949.

HUTCHESON, Circuit Judge, dissenting.

A. Norman Somers, Asst. Gen. Counsel, National Labor Relations Board, and David P. Findling, Associate Gen. Counsel, National Labor Relations Board, both of Washington, D. C., and Elmer Davis, Chief Law Officer, National Labor Relations Board, of Fort Worth, Tex., for petitioner.

John M. Scott, of Fort Worth, Tex., for respondent.

Before HUTCHESON, WALLER and LEE, Circuit Judges.

WALLER, Circuit Judge.

It is conceded that the respondent has failed to bargain collectively with the Union. The only question involved in this case is whether or not the respondent, Mid-Co Gasoline Company, in the sale of its residue gas was engaged in interstate commerce, or in a business that has such a substantial economic effect on interstate commerce, or affects interstate commerce "in such a close and intimate" fashion, as to bring the respondent under the jurisdiction of the National Labor Relations Board.

The facts in the main were stipulated.[1] In addition to the stipulations between re-

[1] "Mid-Co Gasoline Company is a Texas corporation with its principal office at Corsicana, Texas. The Company is engaged in the operation of a natural gasoline plant and a small refinery in connection therewith at Malakoff, Texas, where the Company produces white gasoline, natural gasoline, butane, kerosene, keresone-distillate fuel oil, and residue gas.

"The Company annually purchases the uses at its Malakoff operations, raw materials valued in excess of $100,000, all of which is received from oil and gas wells located in the State of Texas and within a few miles of the Company's plant. The Company annually manufactures products, including residue gas, valued in excess of $300,000, all of which is sold and delivered to customers located within the State of Texas, who sell said products, other than residue gas, entirely within the State of Texas.

"The Company sells to said various petroleum and refining companies, products valued in excess of $300,000 annually. The Company sells a small amount of residue gas to Athens Natural Gas Company, which supplies the fuel-gas needs of the town of Athens, Texas. The remainder of the residue gas is sold and delivered to the Lone Star Gas Company, which Company, during the year 1946, purchased from the Company 2,018,601 (thousand cubic feet) of residue gas valued in excess of $100,000, all of which entered Lone Star Gas Company's pipe line gathering system which supplies several small Texas towns between the Cayuga oil and gas field where the plant is located, and the city of Dallas, Texas, itself. The Company's gas enters Lone Star's gathering line, which transports gas which originates and is consumed entirely within the State of Texas. Lone Star Gas Company is the only supplier of fuel gas to the residents of the city of Dallas, Texas, although another company furnishes gas to the Dallas Power & Light Company and to a limited number of other industrial consumers. Lone Star sells and delivers gas to certain industrial consumers in the city of Dallas *who are themselves engaged in interstate commerce within the meaning of the National Labor Relations Act.* Included among these consumers are the following companies, together with the dollar value of their purchases:

| Company: | Amount |
| --- | --- |
| Ford Motor Company............. | $ 34,935.38 |
| Texas Textile Mills ................ | 2,691.94 |
| Swift & Company ................... | 15 287.14 |
| Loose-Wiles Biscuit Company...... | 21,489.37 |
| Southwestern Bell Telephone Co.... | 3,796.74 |
| The Texas Company ................ | 42,746.28 |
| The Guiberson Corporation........ | 2,986.41 |
| Continental Gin Company .......... | 4,880.27 |
| Tex-O-Kan Flour Mills Company.. | 1,918.48 |
| Dallas Power & Light Company.... | 1,625.27 |
| Proctor & Gamble Mfg. Company.. | 76,063.64 |
| Sears, Roebuck & Company........ | 16,489.71 |
| Total ........................... | $224,910.63 |

These figures are for the year 1946.

Lone Star Gas Company owns no producing properties itself, and all gas transported or sold by it is purchased from other producers." (Italics supplied.)

(Note: The italicized phrase: "who are themselves engaged in interstate commerce within the meaning of the National Labor Relations Act." was changed by agreement to read: "whose operations affect commerce within the meaning of the Act.")

spondent and the Board, interrogatories propounded to, and answered by, Julian L. Foster, General Superintendent of Lone Star Gas Company,[2] and W. F. Wright, General Manager of the Dallas Division of Distribution of Lone Star Gas Company,[3] the buyer of all the residue gas of the respondent except a small quantity to the Athens Natural Gas Company, supplier of fuel gas to the town of Athens, Texas, were made part of the record.

Residue gas is that which remains after the respondent has extracted the butane, gasoline, kerosene, and kerosene-distillate fuel oil.

From the stipulations and answers to the interrogatories that stand uncontradicted, the following facts appear:

1. The respondent is not a producer, but a processor, of natural gas, that purchases all of its raw materials—amounting to approximately $100,000 annually—from gas wells within the State of Texas.

2. From the gas so purchased the respondent extracts gasoline, white gasoline, butane, kerosene, fuel oil, and residue gas. (It is the effect on interstate commerce of the processing and sale of this residue gas that the Board insists gives it jurisdiction over respondent.)

---

[2] "1. Question. In the event of either a stoppage of the gas supply in the S and 2nd S gathering pipe lines, can the Company divert into the 2nd S line gas from a line or lines originating in Oklahoma? Answer. No.

"2. Question. Can gas flowing through the Company's gathering lines originating in Grady County, Oklahoma, and running thence to Dallas be diverted into gathering line 2nd S (from the Mid-Co Plant)? Answer. No.

"3. Question. Could a stoppage of the supply of gas furnished by the Mid-Co Gas Company Plant affect the interstate flow of gas through any of the Lone Star Gas Company pipe lines? Answer. No. The reason for this answer is that there is more gas available to Lone Star Gas Company from the Cayuga Field for delivery into lines S and 2nd S than the capacity of said lines, so that any deficiency of supply from Mid-Co could be made up from this other available gas. In addition to this, there are other sources of gas available to Lone Star Gas Company in the general area of the Cayuga Field which are tapped by the pipe lines of Lone Star Gas Company and which are available to meet any deficiency in Mid-Co's deliveries.

"4. Question. Could gas flowing from the Oklahoma sources, in case of a stoppage of the flow of gas from the Mid-Co Company Plant, be used to replace the supply of gas normally coming from the Mid-Co Gas Company Plant? Answer. No. My way of explanation it may be pointed out that the system is so constructed, designed and actually operated that gas flowing from Oklahoma sources would not be used to meet deficiencies in the supply of gas coming from the Mid-Co Gas Company Plant. Other sources of supply in the area where the Mid-Co Gas Company Plant is located would be used to meet any deficiencies from the

Mid-Co Plant. Due to the pressure conditions maintained on lines S and 2nd S, which transport gas obtained from Mid-Co Gas Company, the flow of gas is constantly in a northwesterly direction from the source of supply and never in a southeasterly direction from the sources of supply in the State of Oklahoma.

"5. Question. Are there connecting valves at all pipe-line junctions shown on the map which control and make possible the flow of gas in any direction desired? Answer. The valves in the main transportation lines of Lone Star Gas system are installed and used for the purpose of cutting on and off the supply of gas as operating conditions at a particular point may demand. They are not used to control the directional flow of gas. The directional flow of gas is controlled by the location of market demand and the engineering and design of the pipe lines and source of supply. There are no connecting valves at pipe-line junctions which make possible the flow of gas in any direction desired."

[3] Mr. Wright, in answer to Interrogatory No. 7, stated that the Lone Star Gas Company, during the year 1946, sold industrial gas in the amount of 176,537.6 M. cubic feet and domestic gas in the amount of 4,458.4 M. cubic feet to the following railroads:

T. & P. Ry.

T. & P. Terminal Warehouse (motor freight).

T. & N. O. Ry.
M. K. & T. Ry.
Union Terminal.
Rock Island Ry.
Fort Worth and Denver Ry.
Santa Fe Ry.
Cotton Belt Ry.

No evidence is in the record as to what use was made by the purchasers of such gas.

3. The other by-products extracted from the natural gas, of the value of approximately $300,000 per year, are all sold locally, and it is not urged that the local sale of these commodities confers jurisdiction in the Board. Residue gas, of the approximate value of $100,000 per year, is sold in the State of Texas to the Lone Star Gas Company, and the balance to the Athens Natural Gas Company, above mentioned.

4. Neither the natural gas, the extracts, nor the residue, either before the processing and sale or thereafter, ever moved into, or out of, the State of Texas.

5. During 1946, or the year in which the unfair labor practice occurred, the respondent sold 2,018,601 (M) cubic feet of residue gas of a value in excess of $100,000 to the Lone Star Gas Company, which supplied all the fuel gas used in the city of Dallas as well as gas to a number of industrial consumers that are conceded to be engaged in interstate commerce within the meaning of the Act, 29 U.S.C.A. § 151 et seq. It also sold small amounts of gas to the Western Union Telegraph Company and to certain interstate railroad carriers—all of said gas being consumed locally.

6. Although the Lone Star Gas Company, which concededly was under the Act, also obtained gas from the State of Oklahoma, nevertheless, it seems that none of the gas obtained from the respondent was transported in the same pipe line, or commingled in transportation, with the gas purchased in Oklahoma.

7. In the event of a stoppage in the gas lines from Oklahoma, gas from the Mid-Co Plant could not be diverted into the Oklahoma line, nor could gas from the Oklahoma line be diverted into the line of Mid-Co which carried gas of the latter to the pipes of the Lone Star Company in Dallas. A stoppage of the supply of gas furnished by Mid-Co would not affect the flow of gas from Oklahoma through any of the Lone Star pipe lines for the reason that the flow in the two lines was in opposite directions.

8. The respondent's gas was obtained from the Malakoff, Texas, gas field, but it appears from the evidence that there is more gas available to Lone Star Gas Company in the Cayuga field of Texas than the capacity of the pipe lines from this field to the Lone Star Company distribution lines in Dallas, and in addition there were other sources of gas available to Lone Star Gas Company in the general area of Cayuga field, which were then already tapped by pipe line of, or to, Lone Star Gas Company, in excess of the amount necessary to meet any deficiency occasioned by a stoppage in Mid-Co delivery.

Below are factors which the record fails to show clearly:

1. The total amount of residue gas requirements of the Lone Star Gas Company during the year in question, or the percentage of the total annual requirements supplied by Mid-Co.

2. The amount of gas in the Cayuga field then deliverable through existing connections to the gathering lines of Lone Star Company in any fixed period.

3. The amount of gas in the Malakoff field then deliverable through existing connections to the gathering lines of Lone Star in any fixed period.

4. Whether all the gas furnished by the Lone Star to industrial consumers in Dallas is residue gas, or whether any portion of the gas so supplied is natural gas, with the by-products unextracted, and whether, if the Mid-Co should cease its processing and sale of natural gas, the same amount of unprocessed natural gas would be available to, and utilizable by, Lone Star Gas Company in a practical, reasonable, and economical operation of its business.

5. Whether or not the pipe lines through which Mid-Co obtained its supply of natural gas and delivered its residue gas to Lone Star Company were owned or controlled by Lone Star, so as to have been available to it for the transportation of suitable gas in the event of a cessation of operations by Mid-Co.

6. What proportion the gas sold by Lone Star in 1946 to those consumers named in the stipulation and shown in the answers to the interrogatories as being engaged in interstate commerce, bore to the

total sales in that year by Lone Star in Dallas, and what proportion such sales to such consumers bore in the year 1946 to the total gas sold by Lone Star in that year to all its consumers in the State of Texas, and what proportion such sales to interstate consumers bore to the total gas received during that year from Oklahoma.

7. It was stated, in answer to an interrogatory, that more gas is available to the gathering lines of the Lone Star Company in the Cayuga field for transmittal than the capacity of the lines, but it is not shown whether the lines running from Cayuga to Dallas are sufficient, together with other gas available to Lone Star, exclusive of that furnished by Mid-Co to have supplied the requirements of its customers during the year in question, nor is there a comparison shown between the cost per M. cubic feet to Lone Star of the gas obtained from Cayuga and the cost of that obtained from Mid-Co.

8. What percentage of the gas requirements in 1946 of Lone Star for Dallas users was supplied by gas received from Oklahoma in comparison with the quantity of gas received from: (a) Cayuga field; and (b) Mid-Co.

9. What the relative cost was to Lone Star in 1946 of gas received from Oklahoma in comparison with the cost of gas received from Mid-Co and whether the cessation of the supply of gas from Mid-Co would be calculated to affect the price which Lone Star would be required to pay for Oklahoma gas upon a cessation of business by Mid-Co.

■ It is quite clear from the decisions in N. L. R. B. v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; Consolidated Edison Company of N. Y. v. N. L. R. B., 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126; N. L. R. B. v. Fainblatt, 306 U.S. 601, 59 S.Ct. 668, 83 L.Ed. 1014; and Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L. Ed. 122; that the Act does not impose collective bargaining upon all industry regardless of effects upon interstate or foreign commerce, and that in order to show that a particular operation—not itself in interstate commerce—affects such commerce in such fashion as to be subject to federal control, it must be made to appear that the business bears such a close and intimate relation to such commerce, or has such a substantial economic effect on such commerce that a work stoppage in the employer's plant would impede, burden, or obstruct interstate commerce or the free flow thereof. N. L. R. B. v. J o n e s & Laughlin Steel Corporation, supra; Consolidated Edison Co. v. N. L. R. B., supra. And this test has been applied to situations where a work stoppage would interfere with the flow of materials only to customers within the state but who were engaged in interstate commerce. Pueblo Gas and Fuel Company v. N. L. R. B., 10 Cir., 118 F.2d 304. It has also been held in N. L. R. B. v. Bradford Dyeing Association, 310 U.S. 318, 60 S.Ct. 918, 84 L.Ed. 1226, that in instances where the materials processed are moved to and from the processor by their owners through the channels of interstate commerce the fact that the employer's customers might be able to procure material elsewhere in the same state is not necessarily controlling.

■ But whether or not the business of the employer—concededly not in interstate commerce—has that close and intimate connection or substantial economic effect on interstate commerce, must, under the decisions in N. L. R. B. v. Fainblatt, supra, and Consolidated Edison Co. v. N. L. R. B, supra [305 U.S. 197, 59 S.Ct. 214] be "determined as individual cases arise".

It is true that in the record there is the uncontradicted statement in answer to one of the interrogatories that: "* * * there is more gas available to Lone Star Gas Company from the Cayuga Field for delivery into lines S and 2nd S than the capacity of said lines, so that any deficiency of supply from Mid-Co could be made up from this other available gas. In addition to this, there are other sources of gas available to Lone Star Gas Company in the general area of the Cayuga Field which are tapped by the pipe lines of Lone Star Gas Company and which are available to meet any deficiency in Mid-Co's deliveries."

But this answer is obviously a conclusion of the witness and does not state the essential facts from which the Board could exercise the function assigned to it of drawing conclusions. Moreover, the answer fails to give all the facts whereby an accurate conclusion could be drawn by the Board as to the economic effect upon the interstate commerce of a cessation of operations by Mid-Co.

■ In the light of the obligation of the Board and the Court to determine the relationship of the business to commerce and its effect thereon from the facts in this individual case, we have concluded that this proceeding should be remanded to the Board for the taking of such further evidence as is available on the factors enumerated above in Paragraphs 1-9 which the record fails to show. To the initiate each of these may not present a $64 question, but to the uninitiate they are not all foolish and the answers to each seems to have a material bearing on a proper determination of the issue presented here.

The case is, therefore, remanded to the Board for the taking of such further evidence as is available and relevant on the omitted matters mentioned hereinabove, and the Board is directed thereafter to make further findings of fact and conclusions of law thereupon. Meanwhile no order of enforcement by this Court shall be made pending such further proceedings.

HUTCHESON, Circuit Judge (dissenting).

I am of the firm opinion that the record as it comes to us contains all the information necessary for our decision of the question presented. I am also of the opinion that the taking of further evidence as required by the opinion is not only wholly unnecessary but unduly burdensome. I, therefore, respectfully dissent from the views the opinion expresses as to the deficiencies in the record and from the order remanding the cause to the Board for the taking of further evidence.