## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## CARTERET TOWING COMPANY, Inc., Respondent.

No. 8623.

United States Court of Appeals Fourth Circuit.

Argued June 14, 1962.

Decided Sept. 13, 1962.

---

836

Paul J. Spielberg, Attorney, National Labor Relations Board (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Assistant Gen. Counsel, and Allison W. Brown, Jr., Attorney, National Labor Relations Board, on the brief), for petitioner.

Claude R. Wheatly, Jr., Beaufort, N. C., for respondent.

Before HAYNSWORTH, BOREMAN and BRYAN, Circuit Judges.

HAYNSWORTH, Circuit Judge.

The respondent resists enforcement of an order of the National Labor Relations Board requiring it to bargain with a union certified as the representative of its employees. In doing so, it contends that neither it nor its employees is engaged in commerce and that the controversy does not "affect commerce" within the meaning of the National Labor Relations Act.[1]

Carteret Towing Company, Inc. operates two tug boats in the harbor of Morehead City, North Carolina and adjacent waters. It is stipulated that it receives each year $40,000 under a contract with the United States Navy, pursuant to which Carteret's tugs assist Naval vessels entering and leaving the harbor at Morehead City. In addition, it has gross

1. 29 U.S.C.A. § 151 et seq.

annual revenues of approximately $150,-000 for navigation services furnished by its tugs to large commercial ocean-going vessels entering and leaving the harbor at Morehead City. These commercial vessels are engaged in the transportation of freight and passengers between Morehead City and other ports in the United States and foreign countries.

Carteret has eight employees, of whom five work as crewmen aboard its two tug boats. In the earlier representation case, the five crewmen were found to be a unit appropriate for collective bargaining. In a Board supervised election, these five voted in favor of representation by the Inland Boatmen's Union of Seafarers International.[2] The Board then certified the union as the bargaining representative of the employees. Carteret refused to bargain with the union. When charged in this complaint case with a violation of § 8(a) (5) of the Act by reason of its refusal to bargain, it defended upon the ground that the Board was without jurisdiction.

 At the outset, Carteret contends that it is not engaged in interstate commerce within the meaning of the Transportation Act of 1940.[3] Indeed, it is not a carrier engaged in transportation in interstate or foreign commerce within the meaning of the Transportation Act of 1940, but that by no means suggests that it is not an employer whose activities affect commerce within the meaning of the National Labor Relations Act. The two statutes are not and never purported to be correlative. In the Transportation Act of 1940, Congress undertook the regulation of carriers and carriage directly involved in interstate and foreign transportation. It did not then undertake to extend a regulatory hand to transportation services related, or even essential, to the activities of regulated carriers, when the transportation services were not themselves transportation in interstate or foreign commerce within the contemplation of the Transportation Act.

The fact that Congress did not elect to regulate harbor tug boat operations in the Transportation Act of 1940 in no way implies a congressional finding that the operation of such tug boats does not affect commerce within the meaning of the National Labor Relations Act, originally enacted in 1935.

It hardly could be contended that the operation of tug boats assisting Naval vessels and large commercial vessels in and out of a harbor is not within the regulatory power of the Congress. It seems never to have been doubted. Over a hundred years ago, the United States Supreme Court held in Cooley v. The Board of Wardens of Port of Philadelphia, 53 U.S. (12 How.) 299, 13 L.Ed. 996, that regulation of pilotage in the Port of Philadelphia had been committed to Congress by the commerce clause of the Constitution. There, it was contended, and the majority of the court held, that a local regulation could be enforced constitutionally because the Congress had not undertaken to exercise its regulatory power in that field.

The two tugs which assist vessels in and out of the harbor at Morehead City and which ease them in and out of their berths are engaged in commerce to the same extent as the pilot who commands and directs the operation.

 In the National Labor Relations Act, particularly in the declarations contained in Section 1, the Congress made it plain that it intended to exercise its commerce power to its constitutional limits. There are no such restrictive definitions as those contained in the Transportation Act of 1940. The Congress intended to have the National Labor Relations Act extend to all employers who engage in commerce. The Board's remedial power extends to any unfair labor practice "affecting commerce."[4]

2. Inland Boatmen's Union of Seafarers International Union of North America, Atlantic, Gulf, Lakes & Inland Waters, AFL-CIO.

3. 49 U.S.C.A. § 902.

4. § 10(a) of the Act (29 U.S.C.A. § 160 (a)).

The obvious breadth of the congressional purpose in enacting the National Labor Relations Act has led to judicial construction of the Act in a manner commensurate with the declared purposes. Activities having a far more tenuous relation to interstate commerce than those here have been frequently held to bring the parties and their activities within the jurisdictional power of the National Labor Relations Board. The cases in the footnote are but illustrative of many.[5] Indeed, judicial interpretation of the jurisdictional power of the National Labor Relations Board has been so broad, that the Board, itself, found it necessary to adopt more restrictive standards for the exercise of its powers.[6] Very appropriately, it decided that it should concern itself with activities having a substantial bearing upon, and a close relationship to, commerce, while relieving itself of the burden of adjudicating controversies which could have only a minimal or remote effect upon such commerce. Thus, it decided that it would exercise jurisdiction over transportation and other enterprises, functioning as essential links in the transportation of passengers or commodities in commerce, only where the gross revenues from the transportation or other enterprises amount to as much as $50,000 per year.[7]

The Board's restraint in the exercise of its jurisdiction has not been universally acclaimed. There was such congressional criticism of it that in 1959 the Congress enacted an amendment to § 14 (c) (1) of the Act, in which it directed the Board not to decline to assert jurisdiction over any labor dispute as to which it would have asserted jurisdiction under its standards prevailing on August 1, 1959. The Board thus had no discretion to decline to exercise its jurisdiction in this case, for the controversy here is well within the Board's jurisdictional standards in effect on August 1, 1959.

Carteret suggests that its stipulation that it assists Naval vessels entering and leaving the harbor and, by its two tugs, provides navigation services to large commercial vessels entering and leaving the harbor at Morehead City is so vague and indefinite that neither this Court nor the Board can appraise the relation of those activities to interstate and foreign commerce. The relationship is shown, however, by the fact that the services of the two tugs are utilized by the ships which pay to Carteret each year approximately $200,000 for those services. It may well be that a Naval vessel or a freighter of substantial size could enter or leave the harbor at Morehead City without the aid of a tug or of a pilot. It may be that any such vessel could be docked or leave its berth without such assistance. That the use of the tugs is beneficial to the ships and expedient is so plainly shown by their employment, however, that there is no basis for denial that operation of the tugs is an activity affecting the movements of the ships in commerce.

Finally, Carteret contends that Morehead City is a flourishing and growing little port which has been entirely free of labor disputes. It attributes this to the absence of employee organization and it envisions what it regards as the intrusion of the Board as encouragement rather than elimination of labor disputes. The contention is directly at odds with the congressional findings and declarations contained in § 1 of the Act. It is

5. See N. L. R. B. v. Baltimore Transit Company, 4 Cir., 140 F.2d 51; N. L. R. B. v. Norfolk Shipbuilding & Drydock Corp., 4 Cir., 109 F.2d 128; N. L. R. B. v. Holtville Ice & Coal Storage Co., 9 Cir., 148 F.2d 168; N. L. R. B. v. Dixie Terminal Co., 6 Cir., 210 F.2d 538, 43 A.L.R.2d 902; N. L. R. B. v. El Paso-Ysleta Bus Line, Inc., 5 Cir., 190 F.2d 261; N. L. R. B. v. Robinson, 6 Cir., 251 F.2d 639.

6. See Guss v. Utah Labor Relations Board, 353 U.S. 1, 77 S.Ct. 598, 1 L.Ed.2d 601; N. L. R. B. v. Fainblatt, 306 U.S. 601, 59 S.Ct. 668, 83 L.Ed. 1014.

7. H. P. O. Service, Inc., 122 N.L.R.B. 394. Here, that standard is met, for Carteret's annual revenues from its services to commercial vessels was far more than the $50,000 minimum determined by the Board as the basis of an exercise of its discretionary jurisdiction.

not for each individual employer to decide the appropriate means to control and eliminate labor disputes which adversely affect and burden commerce. The congressional determination, long since upheld,[8] forecloses any such contention.

Order enforced.

8. N. L. R B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 803; N. L. R. B. v. Fruehauf Trailer Co., 301 U.S. 49, 57 S.Ct. 642, 81 L.Ed. 893, 918; N. L. R. B. v. Friedman-Harry Marks Clothing Co., 301 U.S. 58, 57 S.Ct. 645, 81 L.Ed. 893, 921.