NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

Hudson T. MARSDEN, A Sole
Proprietorship, Respondent.

No. 478, Docket 82–4101.

United States Court of Appeals,
Second Circuit.

Argued Nov. 24, 1982.

Decided Feb. 23, 1983.

William Wachter, Atty., N.L.R.B., Washington, D.C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Mendelssohn McLean, N.L.R.B., Washington, D.C., of counsel), for petitioner.

Donald F. Potter, Rochester, N.Y. (Culley, Marks, Corbett, Tanenbaum, Reifsteck & Potter, Rochester, N.Y., of counsel), for respondent.

Before PIERCE, WINTER and PRATT, Circuit Judges.

WINTER, Circuit Judge:

The National Labor Relations Board petitions for enforcement of its decision and order against Hudson T. Marsden, requiring Marsden to cease and desist from certain unfair labor practices and to reinstate or otherwise compensate certain employees discharged after participating in what Ad-

ministrative Law Judge D. Barry Morris found to be protected concerted activity under Section 7 of the National Labor Relations Act, 29 U.S.C. § 157 (1976). Marsden applies for review of the Board's decision and contends, first, that the NLRB lacks jurisdiction because of the purely local nature of his business, and second, that the conduct of the employees in question did not constitute Section 7 protected activity. While we find that the Board acted within its jurisdiction, we agree with Marsden that the conduct of the employees involved was not protected under Section 7.

We therefore deny enforcement and vacate the decision.

### BACKGROUND

Hudson T. Marsden is a pavement contractor doing business as a sole proprietorship. During May 1980, he was engaged in repairing and installing sidewalks under a contract with the city of Rochester, New York. At that time, Marsden employed eight workers, three cement finishers, Strothers, Boston, and Cooper, and five laborers, Young, Ruffin, Cole, Porter and Laine. These employees were not represented by a labor organization.

On Monday, May 19, 1980, it was foggy and drizzling when the employees reported to work around 7:30 in the morning. At about 7:45 or 8:00, Marsden came out and asked Strothers and Porter if, given the weather, they thought that work should start for the day. Strothers and Porter agreed to "give it a try." They then packed their equipment and drove to the jobsite several blocks away.

At 9:30 a.m., Marsden left the jobsite on a banking errand which kept him away for approximately 45 minutes. In the course of this errand, Marsden stopped at a phone booth and believing the weather was actually improving, scheduled delivery of an order of concrete costing $987 for that afternoon. Meanwhile, at the jobsite, the men, apparently led by Strothers, began discussing whether or not to continue working in the rain. Several workers suggested that they put off deciding until the end of

their regular 10 a.m. coffee break. During the break, the men took shelter for about 10 minutes and most of them then decided to leave the jobsite. Thereafter, they all left for the day.

All parties are agreed that Marsden's normal and well-known procedure in inclement weather was for the employees to take shelter either in the doorways of nearby buildings, on someone's porch, in the tool shanty, or in the trucks. It is evident from the record that on May 19 there were enough trucks and cars at the jobsite for all the men to take shelter. On previous occasions, the men had waited for up to an hour to see whether rain would let up, and, if it did not, Marsden or his son would tell the men to leave for the day. The workers were always paid for this waiting time.

After the coffee break discussion, Strothers, who had been most active in complaining about the weather, went among the other workers, picked up their tools, and, as was his job, loaded the tools in a pickup truck and set out to return them to the central storage area. The rest of the men then left the jobsite in their vehicles, with Strothers and Porter in the lead in Marsden's trucks. On the way back to the shop, Strothers encountered Marsden who was returning to the jobsite. Strothers explained to Marsden that the men had decided to knock off for the day, and although accounts of the conversation differ, it is clear that Marsden became somewhat exercised. However, he succeeded in cancelling the order for concrete he had just put in.

The weather conditions on May 19 were neither severe nor unusual. The National Oceanic and Atmospheric Administration recorded only trace precipitation, or less than .01 inch of rain. The ALJ described the precipitation as "drizzle or light rain." Nearby, outdoor construction jobs continued to work throughout the day, and a civil engineer who inspected the Marsden jobsite testified that the rain was "very light" and that Marsden's men "had worked in harder rain a lot of times." Boston in fact continued to work until Strothers picked up his tools. Cole testified that it was "not really"

raining too hard to work and that he left because "everybody else was leaving, you know." When further pressed regarding his reason for leaving work, he stated that he "didn't feel like" working because of a "bad weekend." Boston testified that it "wasn't raining that hard" and that he had not considered putting on his own personal raingear or stopping because of the weather until Strothers picked up his tools. Laine similarly stated that the drizzle was not heavy enough to force the men to discontinue work and that Strothers gave no reason for his conduct that day other than "He just didn't want to work." Cooper described the weather as a "light mist" and recalled telling Strothers that conditions were not bad enough to leave. He also stated that after they left, the men went to Young's house to spend the day, only to find that by eleven o'clock, the sun was shining. Marsden and Laine, who lived nearby, returned to the jobsite in the afternoon and spent the rest of the day refilling dirt around the hardened concrete forms.

When the workers reported the next day, May 20, Marsden had words with them regarding their abandonment of the job. The upshot was that Marsden fired Strothers on the spot, instructed Young, Laine and Boston to go to work, and left Porter, Cole and Ruffin "standing there." When Porter, Cole and Ruffin reported for work on the twenty-first, Marsden told them that there was no work for them to do and gave them their checks. Strothers also received his check, although under even more acrimonious circumstances. Marsden rehired Cole and Ruffin the following Monday, after a "preliminary investigation as to what happened." By the twenty-sixth, Marsden had concluded that all the men, save Strothers and Porter, were "under duress and influenced by other people" because they "had no choice of transportation back to [the] shop and they couldn't hold ·or conduct any work on their own."

Strothers filed an unfair labor practice charge against Marsden, and, on July 25, 1980, the General Counsel issued a complaint alleging that Marsden had violated Section 8(a)(1) of the National Labor Relations Act by interfering with his employees' exercise of rights protected by Section 7 of the Act. The case was referred to Administrative Law Judge D. Barry Morris who held a hearing and issued his rulings, findings of fact, and order on August 7, 1981. That decision became the final decision and order of the Board on January 5, 1982.

Relying upon *N.L.R.B. v. Washington Aluminum Co.*, 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962), the ALJ concluded that Marsden's employees walked off the job because they were unwilling to work in the rain and were, therefore, engaged in a protected work stoppage to protest uncomfortable working conditions. He found that Marsden's sole reason for discharging the four employees in question was their participation in the work stoppage and that all other reasons proffered by Marsden for his conduct were merely pretextual. The ALJ believed that the reasonableness of the employees' motives was irrelevant to the protected nature of their conduct and that the "crucial element" was their subjective perception of discomfort in their working conditions.

## JURISDICTION

Marsden initially contends that the NLRB lacks jurisdiction because his business has insufficient ties to interstate commerce. Marsden's contract with the city of Rochester involved payments of more than $50,000 and, during the period in question, materials valued at more than $50,000 were purchased by the city government from suppliers outside New York State. He argues, however, that the Board has not shown any connection between the city's purchases and his own sidewalk replacement business and that there is no effect on interstate commerce since his purchases of materials and his jobs are all within Monroe County, New York.

We disagree. Congress intended to vest the Board with the fullest possible jurisdiction consonant with the commerce clause. *N.L.R.B. v. Reliance Fuel Oil Corp.*, 371 U.S. 224, 226, 83 S.Ct. 312, 313, 9

L.Ed.2d 279 (1963). This jurisdiction extends to essentially local enterprises which only indirectly affect interstate commerce so long as that effect is more than *de minimis*. *See e.g., N.L.R.B. v. Fainblatt*, 306 U.S. 601, 606–7, 59 S.Ct. 668, 671–72, 83 L.Ed. 1014 (1939). In *Siemons Mailing Service*, 122 N.L.R.B. 81 (1958), the Board set forth standards currently in use for the exercise of its jurisdiction, and concluded that

> [I]t will best effectuate the policies of the Act if jurisdiction is asserted over all nonretail enterprises which have an *outflow or inflow across State lines of at least $50,000, whether such outflow or inflow be regarded as direct or indirect.*

*Id.* at 85. "Indirect outflow," the critical term for the present case, refers to "sales of goods or services to users meeting any of the Board's jurisdictional standards except the indirect outflow or indirect inflow standard." *Id.* While the city of Rochester is itself exempt from the jurisdiction of the NLRB, it has been the Board's practice to treat transactions by exempt organizations as predicates for the exercise of jurisdiction under the indirect outflow rule where the transactions are of sufficient magnitude to justify the assertion of jurisdiction over a nonexempt organization. *Id.* at 85 n. 12; *see e.g., Carroll-Naslund Disposal, Inc.*, 152 N.L.R.B. 861, 862–63 (1965), *enf'd* 359 F.2d 779 (9th Cir.1966) (jurisdiction based upon $45,000 contract with the city of Lewiston, Idaho, which purchased goods worth more than $50,000 from outside Idaho, and $7,236 in income derived from other enterprises which met the NLRB's jurisdictional standards.) Thus, under the *Siemons* indirect outflow standard, the NLRB properly asserted jurisdiction over Marsden as a consequence of his contract with the city of Rochester.

■ Marsden nevertheless contends that NLRB jurisdiction fails because the Board presented no evidence to link Marsden directly to any of Rochester's interstate purchases or to any effect on interstate commerce. Proof of a direct link, however, is not necessary under the indirect outflow standard. Operations purely local in char-

acter may nevertheless affect interstate commerce where the aggregate impact on commerce of like enterprises in like situations is significant. *Wickard v. Filburn*, 317 U.S. 111, 127–28, 63 S.Ct. 82, 90, 87 L.Ed. 122 (1942); *N.L.R.B. v. Reliance Fuel Oil Corp.*, 371 U.S. at 226, 83 S.Ct. at 313. Marsden's business is of such a character and we therefore reject his jurisdictional challenge.

## THE LEGALITY OF THE DISCHARGES

■ Section 7 of the National Labor Relations Act, 29 U.S.C. § 157, guarantees employees the right to engage in "concerted activities for the purpose of . . . mutual aid or protection." Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1) (1976), implements this guarantee by rendering it unlawful for an employer to "interfere with, restrain, or coerce employees in the exercise of" their Section 7 rights.

Relying on *N.L.R.B. v. Washington Aluminum Co., supra*, the Board held that the work stoppage by Marsden's employees was a protected exercise of Section 7 rights. In that case, seven unorganized workers left their jobs without permission to protest the fact that the machine shop in which they worked was unheated on one of the coldest days of the year. The issue of heat had been a continuing source of controversy between the employees and the employer, and some or all of the employees had individually complained to the employer's representatives on previous occasions about the cold conditions in the shop. 370 U.S. at 11–12, 14–15, 82 S.Ct. at 1101, 1102–03. The walkout was aimed at forcing the employer to heat the section of the plant where the men worked. *Id.* at 11–12, 82 S.Ct. at 1101. The Court's holding is thus predicated upon the fact that the work stoppage was resorted to as a method of bringing about a specific change in the employer's policies relating to the work force.

We believe that the present case is distinguishable from *Washington Aluminum* because the events here did not involve a walkout in support of a demand for a

change in the employer's policies involving terms and conditions of employment. Marsden's employees decided, on an *ad hoc* basis, not to work on a particular day during a drizzle or light rain. Marsden was not asked to modify any policy or to respond in any way. No demand was ever communicated regarding any desired change in terms and conditions of employment and the employees' actions on that day by no means precluded working in heavier rain on future jobs.[1] No explanation is offered for the employees' failure to follow the usual policy of taking shelter rather than leaving work on the day in question, particularly since there was adequate shelter available and Marsden always paid for waiting time.[2]

The effect of the Board's decision is to create a *per se* rule that employees may decide to leave work "concertedly" and under the protection of Section 7 whenever they decide there is something undesirable about working on a particular day.[3] We find no support for such a *per se* rule in *Washington Aluminum*. It is true that decision stated that a specific demand need not be presented to the employer before the walkout for it to fall under Section 7. It did not do away with the requirement that the walkout be in support of some demand, however poorly articulated, communicated in some fashion at some relevant time to the employer. That is precisely what the Court meant when it stated, "The language of § 7 is broad enough to protect concerted activities whether they take place before,

after, or at the same time such a demand is made." *Id.* at 14, 82 S.Ct. at 1102.

The need for such a demand is fundamental to the purpose of the Act. Concerted activities are protected so that employees may share in the determination of their terms and conditions of their employment. Usually this occurs through formal collective bargaining but, as *Washington Aluminum* makes clear, unorganized workers may also resort to concerted economic pressure to obtain similar ends. Participation in the determination of terms and conditions of employment, however, requires some articulation of goals to which an employer can respond even if he or she learns them for the first time after the resort to economic force. Concerted activities, to be protected, must be a means to an end, not an end in themselves. In so holding, we in no way trench upon the principle that the reasonableness of the goals sought through concerted activities is not for the Board or courts to determine. *Id.* at 16, 82 S.Ct. at 1103. We hold only that in the present case no such goals existed.

The lack of any demand for a change in Marsden's policies is not a trivial matter. Once a load of concrete is delivered, it cannot be returned, saved for another day or simply left to harden. Once poured, it must be finished. It is clear, therefore, that if the weather issue is not to be left to Marsden's discretion, a specific policy must be negotiated which accommodates employee desires with business imperatives.[4] If

---

1. If a demand for a policy allowing employees to walk off the job whenever they felt like it were in fact asserted as a bargaining position and supported by a strike, it would be an unfair labor practice in itself. *See Penello v. International Union U.M.W.,* 88 F.Supp. 935, 944 (D.D. C.1950).

2. The Board contends the walkout was protected because the employees' clothes were damp, implying that this constituted uncomfortable working conditions. This is not relevant in view of our grounds for denying enforcement. Moreover, it is a plainly *post hoc* argument since most of the men did not even bother to go home to change clothes after quitting work but rather spent at least a portion of the day at Young's house.

3. As indicated above, several of the men testified that conditions were not so inclement as to interfere with work or to make work uncomfortable. One employee did not even bother to put on the raingear he had with him. Cole, for one, actually testified that his reason for leaving the job was that he had had a "bad weekend." We point this out not to disagree with the ALJ's finding that the principal reason for the men leaving work was the drizzle, but because it is relevant to our holding that the walkout was an *ad hoc* reaction to the weather.

4. The importance of this is underlined by the caselaw indicating that even if the walkout were in support of an articulated demand, it would not have been protected activity if it occurred while an order of concrete was being delivered. *Dobbs Houses, Inc. v. N.L.R.B.,* 325

Marsden must bear the burden of a walk-out, he is at least entitled to some notice of the employees' grievances so he may attempt to respond with a proposal of his own. The walkout here expressed no such grievance but was merely an *ad hoc* reaction to one day's weather. It is not, therefore, protected by the Act.

Enforcement denied; decision vacated.

F.2d 531 (5th Cir.1963) (mass departure of waitresses at dinner hour in protest over firing of a supervisor held unprotected); *N.L.R.B. v. Marshall Car Wheel & Foundry Co.,* 218 F.2d 409, 411 (5th Cir.1955) (employee walkout at moment molten iron ready to be poured held unprotected).