## NATIONAL LABOR RELATIONS BOARD v. COWELL PORTLAND CEMENT CO. (LIME AND CEMENT EMPLOYEES UNION OF CONTRA COSTA COUNTY, LOCAL NO. 21074, A. F. OF L., et al., Interveners).

### No. 9092.

Circuit Court of Appeals, Ninth Circuit.

Nov. 28, 1939.

Rehearing Denied Dec. 30, 1939.

Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Laurence A. Knapp, Asst. Gen. Counsel, and Mortimer B. Wolf, Bertram Edises, and Owsley Vose, Attys., National Labor Relations Board, all of Washington, D. C., for petitioner.

Max Thelen, Gordon Johnson, and Thelen & Marrin, all of San Francisco, Cal., for respondent.

Charles J. Janigian, of San Francisco, Cal., for intervener Lime & Cement Employees Union of Contra Costa Co., Local No. 21074, A. F. of L.

Gladstein, Grossman & Margolis, of San Francisco, Cal., for intervener International Union Mine, Mill & Smelters Workers of America, Local 356.

Before DENMAN, MATHEWS, and STEPHENS, Circuit Judges.

DENMAN, Circuit Judge.

The National Labor Relations Board petitions for our decree enforcing its order against the respondent, Cowell Portland Cement Company, requiring the latter to cease and desist from certain claimed unfair labor practices and to take certain affirmative action. The respondent asserted below and asserts here that the Board lacks jurisdiction over all the matter ordered because the nature of its business is such that it cannot be said to be "in commerce, or burdening or obstructing commerce or the free flow of commerce" within the definition of "affecting commerce" set forth in Section 2(7) of the Act.[1]

[1] 49 Stats. 449, 450, 29 U.S.C.A. § 152(7).

(1) Respondent was engaged in interstate commerce and was subject to the jurisdiction of the Board.

The respondent is one of three corporations having interlocking stock control and common management. The stock of the Henry Cowell Lime and Cement Company is owned by three stockholders, S. H. Cowell, I. M. Cowell and W. H. George. That company owns approximately 95 per cent of the Bay Point and Clayton Railroad Company and of respondent.

The Henry Cowell Lime and Cement Company was organized in 1900 and is one of the oldest dealers in building materials in California, having many branch yards and sales offices, one in Portland, Oregon. It deals and has dealt in all classes of building materials and also other merchandise. The respondent cement manufacturing company was organized in 1907 to manufacture Portland Cement from lime rock, clay and sand in its quarries at Cowell, California, situated in the coast range between 8 and 9 miles southerly of Port Chicago on Suisun Bay. The Bay Point and Clayton Railroad connects the Cowell plant with two railways at Port Chicago, the Southern Pacific and Santa Fe.

The Henry Cowell Company is the sole "agent of the Cowell Portland Cement Company so far as selling is concerned". The cement is not consigned to the Henry Cowell Company but the bill of lading is made by respondent to the ultimate consumer procured by the agency of the Henry Cowell Company and for which a commission is paid the agent. The cement is hauled by two locomotive engines from Cowell to the railways at Port Chicago. One of the engines is owned by respondent and one by the Bay Point and Clayton Railroad. In view of the agency connection of the Henry Cowell Lime and Cement Company with the sales of the cement, there is no merit in the contention that because it is a separate corporation from respondent there is a break in any shipment out of the state rendering respondent's activities solely intrastate in character.

The interstate commerce of the respondent consisted of both imports into and exports from the State of California. Essential to its manufacture of cement is gypsum of which it imports from Nevada annually approximately 2,000 tons. Also it imports for resale white or Medusa cement of which in the seven months prior to the hearing it imported upwards of 1,100 barrels. Of the cement it manufactures, the Board found that between 30,000 and 50,000 barrels per annum were shipped outside the state in the triennium prior to the hearing. The respondent disputes these figures but admits that at least 14,000 barrels per annum were exported. Even taking the respondent's latter statement of exports, these constitute substantial amounts and are not to be treated as de minimis.

Congress has the power to regulate interstate commerce "be it great or small." National Labor Relations Board v. Fainblatt, 306 U.S. 601, 606, 59 S.Ct. 668, 671, 83 L.Ed. 1014. The National Labor Relations Act "on its face * * * evidences the intention of Congress to exercise whatever power is constitutionally given to it to regulate commerce by the adoption of measures for the prevention or control of certain specified acts. * * * Examining the Act in the light of its purpose and of the circumstances in which it must be applied we can perceive no basis for inferring any intention of Congress to make the operation of the Act depend on any particular volume of commerce affected more than that to which courts would apply the maxim de minimis." National Labor Relations Board v. Fainblatt, supra, 306 U.S. 607, 59 S.Ct. 672, 83 L.Ed. 1014.

The quantity of cement shipped out of state is not de minimis merely because it is but a small percentage of respondent's total sales. Otherwise, we would have the anomaly of one plant under federal regulation because exporting its entire product of 14,000 barrels while alongside it another competing plant under state regulation because, though shipping the same amount of 14,000 barrels, they constituted, say, but 4 percent of its product. Congress could not have intended that it would subject laboring men or employers to such a confusing and, in business competition, such a destructive anomaly. Nor is the quantity of a particular product shipped out of state de minimis merely because it is small in proportion to the total interstate commerce in that product from all the states or from the employer's state.

Though respondent's manufacturing activities, separately considered, be deemed intrastate in character, they bear a direct relationship to its interstate activities. Stoppage of respondent's interstate shipments, constituting interruption of or interference with the flow of interstate com-

merce, would directly follow from stoppage by industrial strife of its manufacturing operations. Here the Board charged such industrial strife and upon the evidence found that it existed and constituted such interference with the flow of interstate commerce. We hold that respondent's activities bring it within the scope of the federal regulatory power of the National Labor Relations Act and that the proceeding was within the Board's jurisdiction.

■ (2) The National Labor Relations Board lacked the power to invalidate the closed-shop contract between respondent and the Lime and Cement Employees Union. The Board not only had no jurisdiction of the subject matter of the contract because not mentioned in the Board's several amended complaints but also none in personam because neither the employees nor their union were parties to the hearings leading to the contract's invalidation.

Inter alia the respondent was ordered by the Board to cease and desist from "Giving effect to its contract with Lime and Cement Employees Union of Contra Costa County, No. 21074 * * *."

The Lime and Cement Employees Union is an affiliate of the American Federation of Labor and is hereafter called the A. F. of L. Union. It is an unincorporated association now composed of approximately 200 employees of respondent, hereafter called the A. F. of L. employees. The contract ordered to become ineffectual provided for a closed-shop, a bargaining committee empowered to bargain collectively with respondent "in respect to rates of pay, wages, hours of employment or other conditions of employment." It also provided for a "Grievance Committee of the Union" and for its method of procedure. It also provided for arbitration and agreed that there should be no strikes or lockouts pending arbitration. It is the kind of agreement labor has struggled for the right to obtain over decades of federal and state legislation and it is specifically provided for in sections 8(3) and 9(a) of the National Labor Relations Act, 29 U.S.C.A. §§ 158(3), 159(a).

Neither the A. F. of L. employees nor the A. F. of L. Union were made parties in the Board proceeding leading to the Board's order which purports to destroy their contract. The proceeding below was finally heard on the Board's second amended complaint which, in turn, was amended to conform to certain proofs made at the hearing. In neither the complaint nor in any of the several amended complaints was named the A. F. of L. Union nor, as such, the employees associated in it.

In this condition of the pleadings and order this court, sua sponte, is required to determine whether the Board has jurisdiction of the subject matter of the A. F. of L. Union's contract which its order seeks to destroy and, hence, to what extent, if any, this court has jurisdiction to decree the order's enforcement.

The A. F. of L. Union presented to this court a petition to intervene which came on to be heard, the Board's attorney appearing at the hearing. The petition alleged in terms of its legal effect, the closed-shop contract of the A. F. of L. Union with the respondent. It was granted and thereafter the A. F. of L. Union filed its answer to the petition of the Board.

In the A. F. of L. Union's briefs and at the hearing were pointed out portions of the testimony before the Board sustaining its contention that at the time of the making of the closed-shop contract it had as its members a majority of the then employees of the respondent within the appropriate bargaining unit[2] and that the proposed contract was presented at a meeting held August 26, 1937, in which a majority of the employees of respondent was present and at which its terms were unanimously approved and the officers of the Union were authorized to execute it. Thereafter, on August 27, 1937, the officers so authorized executed the contract with the respondent.

The A. F. of L. Union contends that under the decision of Consolidated Edison Company v. National Labor Relations Board, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126, it was entitled to have its day in the proceeding leading to the order purporting to destroy the closed-shop contract. We accept for purposes of our discussion of this contention the claim of the A. F. of L. Union that the majority of the employees in the appropriate unit had made the closed-shop contract through their designated agent, the A. F. of L. Union, for,

---

[2] There is no question here of appropriate bargaining unit. The Board stated it to be "all the employees at the respondent's Cowell plant, excluding executives, supervisory employees of the rank of foreman and above, and persons having the power to hire and discharge."

obviously, a litigant's right to a day in court is based upon the claims of the excluded party and not upon the adjudication of the proceedings in which it did not participate.

The Board neither alleged nor found that the A. F. of L. Union at the time of or in the making of the contract was dominated or controlled by the respondent in violation of Section 8(2) of the Act and the case in this regard is like the Consolidated Edison Company case.

It is the contention of the Board that other evidence in the record shows that the respondent had locked out its employees on July 16 preceding, that a majority of the employees at the time of the lockout were members of the International Union, Mine, Mill and Smelter Workers of America, Local 356, hereafter called C. I. O. union and that the lockout was purposed to discourage membership in that union. Hence, the Board contends, they continued as employees within the definition of Section 2(3) of the Act and were such at the time of the making of the closed-shop contract and that the contract was not made by the representatives of a majority of the employees. The Board made findings to this effect.

The A. F. of L. Union claims that the findings have no adjudicatory effect on it and that the Board's order that respondent cease and desist from giving effect to its closed-shop contract cannot be enforced because it was not served with any notice of the Board's proceedings and that it did not become a party thereto. The Board made no finding of service on the A. F. of L. Union or that it became a party. The record shows no service on it. There is an affidavit that notice of hearing before the contract was made was mailed to one

Edward D. Vandeleur
Secretary
California State Federation of Labor

but neither Mr. Vandeleur individually nor as secretary nor the California State Federation of Labor is shown to have been at any time an agent to accept service for the A. F. of L. Union.

There is no merit in the contention that the A. F. of L. Union had notice requiring its appearance and warranting a decision adverse to it because its president was a witness produced by respondent at the hearing and testified regarding the contract the A. F. of L. employees had obtained. The fact that one is a witness in a case does not make him nor a company or union of which he is an officer a party nor is a mere witness presumed to know the contents of the pleadings or prayers of the litigants.

Nor is there merit in the contention that because of publicity given the proceeding the A. F. of L. employees or their union should have known the contents of the complaints and, though their contract and their union were not described or named in them, should have informed themselves that something might be done affecting them because the first complaint filed before their union was organized and their contract was made contained an allegation: "The respondent, by its officers and agents, while engaged at the Cowell Plant as described above, during the month of July, 1937, and thereafter, did urge, persuade and warn its employees to form, join and become members of a labor organization not of their own choosing, said labor organization not being the representative of said employees as provided in section 9 (a) of the National Labor Relations Act, and did threaten the said employees with refusal of employment if they refused to join and become members thereof, and did in other ways aid and assist and contribute support to said labor organization."

Nothing more confirms our opinion that the Board intended to deprive the A. F. of L. employees and their union of their closed-shop contract without notice or hearing than its failure in the subsequent amended complaints to amend this allegation and charge the A. F. of L. employees and their union with the illegal making of the contract and serve such an amendment upon some of them or their union. Instead the allegation was repeated without change in two amended complaints filed after the contract was made. Consolidated Edison Company v. National Labor Relations Board, 305 U.S. 197, 234, 238, 59 S. Ct. 206, 83 L.Ed. 126.

Nor is there merit in the contention that the A. F. of L. employees may be deprived of their property rights because what the Board calls "substantial justice" has been done. We do not perceive the validity of such a conclusion before the A. F. of L. employees or their union have been afforded an opportunity to present their case. Substantial injustice may be done if the laborer is not permitted to defend his contract.

■ Similarly, there is no merit in the Board's contention that it has proved the A. F. of L. contract to be "illegal". To us, in the absence of the A. F. of L. Union or any of its members as parties defending their contract, proof of illegality is as meaningless to cause us to invalidate the contract as an argument that with a record showing neither apprehension nor plea of an accused we should sustain a judgment of his conviction because the record contains strong and uncontradicted evidence of guilt.

Nor is there merit in the contention that the destruction of the contract of the A. F. of L. employees is warranted by the decisions in National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307, and National Labor Relations Board v. Pacific Greyhound, 303 U. S. 272, 58 S.Ct. 577, 82 L.Ed. 838. It is true that in these Greyhound cases the employees by joining in unions charged as company dominated had contracts with one another which if valid created in the unions bargaining powers on behalf of the employees. Obviously such contracts of "self organization" making "collective" the individual bargaining powers are contracts creating property rights both in the individuals and the union entity, and such "self organization" contracts and the incidental property rights created are among the rights of laboring men stated in section 7 of the National Labor Relations Act. It is true that the Greyhound cases hold that the employees and their unions were deprived of these contract rights by orders disestablishing the unions without making any one of them a party to the proceedings. It is true also that the employees and their unions thus had no opportunity to show that they were not, in fact, dominated by the employers and that the Board's findings and order were not justified. It is hence true that the Supreme Court has held in the Greyhound cases that such property in union contracts may be destroyed by disestablishing the union, though neither the employees, the contracting parties, nor their union are made parties to the proceeding.

In National Labor Relations Board v. Pacific Greyhound Lines the Supreme Court held that, in the same case, 9 Cir., 91 F.2d 458, 460, we erroneously held the contrary view. It there seemed to us that to destroy the mutual self organization contract of laborers in their union association, without their presence in the proceeding, constitutes a denial of one of their civil liberties. Even where there is a contract between a union and an employer the contract is with the employee members of the union. Consolidated Edison Co. v. National Labor Relations Board, supra, 305 U. S. 233, 59 S.Ct. 206, 83 L.Ed. 126. It also seems that in any realistic consideration of the kind of oppressive and unscrupulous employer against whom the National Labor Relations Act is in part aimed, it is entirely conceivable that an employer, desiring to discredit a union he cannot control, will not resist the charges of the Board that he is controlling it. A decision by such a process, apparently against the employer, but really against the unserved and nonappearing employees and their union, is the kind of injustice which may arise where the employees or their union are not made parties to the proceeding. In this case the evidence shows that while George, the respondent's manager, appeared to favor the A. F. of L. Union, two others connected with respondent, S. H. Cowell and I. M. Cowell, owning virtually all of the stock of the dominant Henry Cowell Lime and Cement Company, and vice-president and secretary respectively of respondent, appeared actively in the controversy and favored the C. I. O. We do not know what the real situation would have been shown to be, if the A. F. of L. employees or their union had explored the differing views of those participating in the dispute. Nor could anyone have known what the disestablished union in the Pacific Greyhound case might have shown if joined as a party.

It is also true that the Consolidated Edison case declines to overrule the Greyhound cases in their destruction of the property right arising from the contract in the formation of the unions. It distinguishes, 305 U.S. page 233, 59 S.Ct. 206, 83 L.Ed. 126, those cases because the contract was not between the employees themselves but between the employer and his employee (the Supreme Court regards the union contracts as contracts of the employer with his employees, 305 U.S. page 233, 59 S.Ct. 218, 83 L.Ed. 126), and that the Board found the Greyhound company "had created and fostered the labor organization in question and dominated its administration in violation of § 8(2)." Here, likewise, the contract was between

the employees and the employer but there is no finding of a violation of section 8(2) of the Act.

While we cannot say that in the Consolidated Edison case the Supreme Court expresses the doctrine that administrative tribunals must conform to "the cherished judicial tradition embodying the basic concepts of fair play" of Morgan v. United States, 304 U.S. 1, 22, 58 S.Ct. 773, 778, 999, 82 L.Ed. 1129, with regard to all the contractual property rights of employees, we hold that such protection must be afforded at least to such rights as are claimed to have been created by the closed-shop contract with the employer here involved. As to such rights, at least, laboring men are now entitled to have them considered under the "basic concepts of fair play" and to have their "day in court" in which they are given the "essentials of a full and fair hearing, with the right * * * to have a reasonable opportunity to know the claims advanced against them * * *." Morgan v. United States, supra, 304 U.S. 21, 58 S.Ct. 777, 82 L.Ed. 1129.

Applying these principles, the A.F. of L. Union should have been given the opportunity to show the validity of its claimed closed-shop contract with respondent and to meet properly framed challenges to its validity, inter alia, the claim that it was not a contract made by a bargaining agent designated by a majority of the employees in the respondent's agreed appropriate unit.

We hold that the Board had neither jurisdiction of the subject matter of the A. F. of L. employees' contract nor of the persons of such employees or their union and, hence, that that portion of the Board's order requiring the respondent to cease and desist in the performance of the A. F. of L. contract is invalid.

Since the contract, which in the absence of parties affected is not adjudicated invalid, shows a closed-shop relationship with the A. F. of L. Union, we likewise hold invalid as destructive of its provisions the following cease and desist orders of the Board:

"1. Cease and desist from:

"(a) Discouraging membership in International Union, Mine, Mill & Smelter Workers of America, Location #356, or any other labor organization of its employees, or encouraging membership in Lime and Cement Employees Union of Contra Costa County, No. 21,074, or any other labor organization of its employees, by discharging or refusing to reinstate any of its employees, or in any other manner discriminating in regard to their hire and tenure of employment or any term or condition of their employment;

\* \* \* \* \* \*

"(c) Recognizing Lime and Cement Employees Union of Contra Costa County, No. 21,074, as the exclusive representative of its employees unless and until Lime and Cement Employees Union of Contra Costa County, No. 21,074, is certified as such by the Board;

"(d) Refusing to bargain collectively with International Union, Mine, Mill & Smelter Workers of America, Local # 356, as the exclusive representative of all its employees at its Cowell plant, exclusive of executives, supervisory employees of the rank of foreman and above, and persons having the power to hire and discharge, in respect to rates of pay, wages, hours of employment, and other conditions of employment;

\* \* \* \* \* \*"

And its order for affirmative action:

"(c) Upon request, bargain collectively with International Union, Mine, Mill & Smelter Workers of America, Local #356, as the exclusive representative of all its employees at its Cowell plant, exclusive of executives, supervisory employees of the rank of foremen and above, and persons having the power to hire and discharge, in respect to rates of pay, wages, hours of employment, and other conditions of employment;".

With regard to the Board's order to cease and desist from: "(e) In any other manner interfering with, restraining, or coercing its employees in the exercise of their right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purposes of collective bargaining or other mutual aid and protection, as guaranteed in Section 7 of the National Labor Relations Act.", it is apparent that without a proper disposition of the A. F. of L. contract these provisions of the order, some capable of a construction inconsistent with the closed-shop relationship, cannot be decreed. For reasons later stated we regard it as impracticable to amend the order to confine its scope.

The affirmative provisions of the order require reinstatement of certain men who may displace the A. F. of L. employees or become employees not members of their union and thus defeat their closed-shop contract. We hence hold invalid the following provision of the Board's order:

"2. Take the following affirmative action, which the Board finds will effectuate the policies of the Act:

"(a) Offer to the employees listed in Appendix A immediate and full reinstatement to their former or substantively equivalent positions, without prejudice to their seniority and other rights and privileges in the manner set forth in the section entitled 'The Remedy' above placing those employees for whom employment is not immediately available upon a preferential list in the manner set forth in said section, and thereafter, in said manner, offer them employment as it becomes available;".

The Board's order for back pay follows immediately and applies to the men to be offered reinstatement in the preceding paragraph. It provides: "(b) Make whole the employees named in Appendix A for any losses of pay they have suffered by the respondent's discriminatory acts, by payment to each of them of a sum of money equal to that which he would have earned as wages if he had been working steadily for the respondent during the period from July 16 to July 30, 1937, and a sum of money equal to that which he would normally have received as wages from October 1, 1937, to the date of the respondent's offer of reinstatement or placement upon the preferential list required by paragraph (a) above, less the net earnings during those periods;".

 The excluded time between August first and October first was deemed by the Board as the normal shutdown period of the plant and we construe the paragraph as a whole as for the period from a lockout by the respondent of its employees on July 16 to the date of their reinstatement. We deem it impracticable to attempt to separate certain transactions occurring prior to August 1 as unrelated to the closed-shop contract and to modify the order to apply to them. The proceeding should be disposed of as an entirety.

 The Board, by an amendment of its rules effective July 14, 1939, embodied therein the right of any labor organization, "not the subject of any 8(2) allegation in the complaint", "a party to any contract with the respondent the legality of which is put in issue by any allegation of the complaint", to be made a party to the proceeding. National Labor Relations Board, Rules and Regulations, Series 2, Article II, Section 5. It had previously recognized the right in an administrative order of January 17, 1939. In our opinion the right always has existed regardless of the Board's orders or rules. Nor does one defect in the proceeding involving invalidation of the contract, namely, failure to plead the contract, excuse another, namely, failure to make the contracting union a party. In the interest of that "fair play" recognized in the Morgan case and in view of the holding in the Consolidated Edison case, supra, 305 U.S. 233, 59 S.Ct. 206, 83 L.Ed. 126, the Board, instead of petitioning here on February 6, 1939, for the enforcement of its order, should have set it aside, amended its complaint, served it on the A. F. of L. Union, and proceeded to a hearing which would have avoided all this delay and confusion.

 The practical solution of this administrative problem is the remand of the proceeding to the Board for such action as it may deem proper. Ford Motor Co. v. National Labor Relations Board, 305 U.S. 364, 373, 59 S.Ct. 301, 83 L.Ed. 221. It is so ordered.

Proceeding remanded.