# Steel Industry Compliance Extension Act of 1981

The Steel Industry Compliance Extension Act of 1981 (Act) permits the Administrator of the Environmental Protection Agency to accede to a steel company's request for an extension of otherwise applicable deadlines for compliance with the Clean Air Act only if the Administrator finds that the company has met its ongoing obligations under its existing consent decrees, or that any violations are de minimis in nature.

While the term "de minimis" is not defined in the Act, the legislative history confirms that it was meant to have its ordinary meaning—that is, "negligible" or "insubstantial or inconsequential."

November 9, 1981

## MEMORANDUM FOR THE ASSISTANT ATTORNEY GENERAL, LAND AND NATURAL RESOURCES DIVISION

This responds to your request for our views concerning the proper construction of the term "de minimis" as used in the Steel Industry Compliance Extension Act of 1981, Pub. L. No. 97-23, 95 Stat. 139 (to be codified at 42 U.S.C. § 7413(e)) (Act), familiarly known as the Steel Tripartite Amendment, Tripartite, and Steel Stretch-out. We have found nothing in the statute or its legislative history to suggest that de minimis was meant to have anything other than its usual meaning—that is, negligible, insubstantial, or inconsequential. *Anderson* v. *Mt. Clemens Pottery Co.,* 328 U.S. 680, 692, 693 (1946). We therefore conclude that the Act does not permit the Administrator of the Environmental Protection Agency (EPA) to enter into or modify a consent decree for the purpose of extending compliance deadlines under the Clean Air Act, 42 U.S.C. § 7401 *et seq.* (Supp. IV 1980), unless the Administrator finds that a company is in compliance with its existing consent decrees, or any violations are of a de minimis nature, as defined, at the time the company applies for an extension.

In reaching this conclusion, we have carefully reviewed the legislative history of the Act, including the House and Senate reports,[1] the

---

[1] H.R. Rep. No. 161, 97th Cong., 1st Sess. (1981), H.R. Rep. No. 121, 97th Cong., 1st Sess. (1981); S. Rep. No. 133, 97th Cong., 1st Sess. (1981).

hearings,[2] and the floor debates.[3] This material makes it clear that both Congress and the members of the Steel Tripartite Committee (Committee) who drafted the Act intended that the EPA Administrator have discretion to grant extensions only to those companies who had met their ongoing obligations under a consent decree.

## I. Background

The Clean Air Act Amendments of 1970, 42 U.S.C. § 1857 *et seq.* (1976) (amending the Air Quality Act of 1967, Pub. L. No. 90–148, 81 Stat. 485 (codified at 42 U.S.C. § 1857–1871*l*) (1970)) (amended 1977), developed lists of air pollutants, promulgated national ambient air quality standards, 42 U.S.C. § 1857c–4 (1970 ed.), and required each state to develop a plan to implement the air quality standards. *Id.* at § 1857c–5. The state, or, if it failed to act, the EPA, was authorized to prevent the construction or modification of any new sources of pollution—such as factories—from being built if the construction would prevent attainment or maintenance of the national air quality standards. *Id.* at § 1875c–5(a) (2)(D), (4). The Clean Air Act Amendments of 1977, 42 U.S.C. § 7401 (Supp. IV 1980), extended the deadlines for meeting most of the standards for pollutants to December 31, 1982. The EPA Administrator was charged with seeking injunctions and recovering civil penalties against those who violate the Clean Air Act's provisions. 42 U.S.C. §§ 7413, 7420 (Supp. IV 1980). Through this enforcement mechanism, the Administrator has brought actions and, in most instances, obtained consent decrees. Mandatory investment schedules contained in those decrees insure, through the mechanism of the threat of stipulated damages, that the companies meet the 1982 final compliance deadline.[4]

By 1979, when the EPA had reached consent decrees with most of the major steel companies, H.R. Rep. No. 121, *supra,* at 4–8 (Table 1), expenditures for pollution control had become a major drain on the resources available to the steel industry for capital investment. In 1980, for example, 19% of the steel industry's annual capital expenditure was for pollution control. This was far greater than that spent by comparable heavy industries such as the electric utilities (9.2%) or the automo-

---

[2] *Steel Tripartite Committee Proposal: Hearings on H.R. 1817, H.R. 2024, H.R. 2219, et al. Before the Subcomm. on Health and the Environment of the House Comm. on Energy and Commerce,* 97th Cong., 1st Sess. (1981) [hereafter cited as *Hearings on H.R. 1817*]; *Steel Industry Compliance Extension Act of 1981: Hearing on S. 63 Before the Senate Comm. on Environment and Public Works,* 97th Cong., 1st Sess. (1981) [hereafter cited as *Hearing on S. 63*]; *Report of the Steel Tripartite Comm. Hearings Before the Senate Comm. on Environment and Public Works,* 96th Cong., 2d Sess (1980) [hereafter cited as *Tripartite Hearings*].

[3] 127 Cong. Rec. H3747–52 (daily ed. June 26, 1981); *id.* at S6985–87 (daily ed. June 25, 1981); *id.* at S6605 (daily ed. June 19, 1981); *id.* at S6090–93 (daily ed. June 11, 1981); *id.* at H2463–64 (daily ed. May 28, 1981); *id.* at H2444–56 (daily ed. May 28, 1981).

[4] *See* C. Stewart, Air Pollution, Human Health and Public Policy 35–48 (1979). *See generally,* Environmental Law Institute, Air and Water Pollution Control Law 1980 (G. Wetstone, ed. 1980); *Hearing on S. 63, supra,* at 62 (Report of the Steel Tripartite Advisory Committee Working Group on Environmental Protection).

tive industry (5.4%). *Id.* at 9 (Table 2). Not only was the percentage of capital invested higher, it was also more difficult for the steel industry to raise. *Id.* (Table 3). This, the steel companies argued, was due to pressure on the industry by the federal government not to raise prices, making it increasingly difficult to recapture costs, and because of the willingness of the federal government to sacrifice the domestic steel industry to foreign policy considerations by allowing "dumping" of foreign steel. *Hearings on H.R. 1817, supra,* at 48-9; *Tripartite Hearings, supra,* at 101-02 (report prepared by the Congressional Research Service).

The Steel Tripartite Committee was formed to advise the President on the steel industry's problems and to suggest ways to revitalize the industry. It was made up of representatives of the senior management of the steel companies, the United Steelworkers of America Union, and the federal government. The Committee's working group on environmental issues later added a fourth member, the Natural Resources Defense Council (NRDC).[5] These disparate groups brought to the negotiating table concerns about the flagging health of the steel industry, the protection of local economies threatened by plant closings, the promotion of worker health and safety, and the public's interest in continued progress toward the goals of the Clean Air Act. Out of their dynamic balancing of interests and resultant compromises came the 1981 amendments embodied in the Act. In order "to provide the steel industry with vitally needed capital for modernization, while maintaining public health and environmental protection," the Committee proposed that steel companies be given 3 more years in which to meet the requirements of the Clean Air Act. H.R. Rep. No. 121, *supra,* at 8-9. The "trade-off" for the extension of the deadline for compliance with the Clean Air Act was that the companies obtaining the benefit of the extension would invest in modernization efforts the capital resources which would otherwise have gone into more immediate compliance efforts.[6] The compromise reflected by the Act was, therefore, to improve the efficiency and productivity of the American steel industry at the cost of some temporary setbacks in the achievement of the goals for cleaner air contained in the Clean Air Act. However, to ensure that the companies would not abandon progress toward pollution control, each company applying for an extension would have to meet six carefully crafted conditions. In order to consent to an extension of the schedule for compliance, the EPA Administrator would have to find:

---

[5] The NRDC is a national environmental group which frequently plays an active role in the legislative process. It was invited to join the working group by the Executive Office of the President and the United Steelworkers of America Union.

[6] Since the newer equipment would contain the most modern technology, it was argued that it would usually be cleaner than what it was replacing.

(A) That the extension is necessary to allow the company to make capital investments designed to improve efficiency and productivity;

(B) That funds equal to what would otherwise have been spent by December, 1982 on pollution control will be spent within two years on capital investments;

(C) That the company will enter into a consent decree establishing a schedule for bringing all its stationary sources of pollution into compliance;

(D) That the company will have enough money to comply with its consent decrees;

(E) That the company is in compliance with existing federal consent decrees or that any violations are de minimis in nature; and

(F) That any extensioin will not result in degradation of air quality during the extension.

*See* Act, § 113(e)(1) (A)–(F). Each of these requirements was included in response to objections that the Act was special-interest legislation. On each of the six, the company "bears the burden of proof." H.R. Rep. No. 121, *supra,* at 10.

Section 113(e)(1)(E) is Congress' response to critics who claimed the Act would "give relief to those companies which have been avoiding the law and penaliz[e] those who have complied." *Tripartite Hearings, supra,* at 27 (Follow-up Questions for EPA). As finally enacted, § 113(e)(1)(E) requires that

the Administrator find[ ], on the basis of information submitted by the applicant and other information available to [the Administrator] that the applicant is in compliance with existing Federal judicial decrees (if any) entered under section [113] of this Act applicable to its iron- and steel-producing operations or that any violations of such decrees are de minimus [sic] in nature.

Act, § 113(e)(1)(E). You have asked us to consider what kind of violations can be considered de minimis.

## II. The Meaning of De Minimis Under the Act

De minimis is not defined in the Act. It was suggested as the standard by Ms. Frances Dubrowski, NRDC representative, during the late stages of the Committee's drafting of the Act.[7] The suggestion was made in response to the steel industry's suggestion that the test be "substantial compliance" with one's consent decree.[8] That the parties

---

[7] Telephone conversation with Mr. Stephen D. Ramsey, Chief, Environmental Enforcement Section, Land and Natural Resources Division, United States Department of Justice, October 16, 1981.
[8] *Id.*

intended a narrow definition is supported by the Senate report which states:

> A de minimis violation of an emission limitation is a violation resulting from circumstances beyond the control of the source owner or employee which causes no measurable increase in emissions from a source.

S. Rep. No. 133, *supra,* at 4. "The intent of this provision is twofold: to ensure that pollution control expenditures required to be made before the grant of an extension under this act are not deferred and to ensure that only those companies making a good faith effort to comply with existing environmental obligations obtain the benefit of further deadline extensions." H.R. Rep. No. 121, *supra,* at 10.

De minimis matters have traditionally been defined as "negligible," "trifles," "insubstantial and insignificant." *Anderson* v. *Mt. Clemens Pottery Co.,* 328 U.S. 680, 692, 693 (1946).[9] The legislative history is scanty on the issue, but what there is reflects this understanding. The Senate report, for instance, defines de minimis violations of a consent decree as those resulting in "no measurable increase in emissions from a source." S. Rep. No. 133, *supra,* at 4. A violation that "result[s] from circumstances beyond the control of the source owner" would bar even a minor violation, if caused by the owner's fault or neglect. *Id.* And a violation that really causes "no measurable increase in emissions" must be one so minor as to be truly insignificant. *Id.*

Whether a particular violation is de minimis is a decision that must initially be made by EPA, since the discretion belongs to the Administrator and it is his expertise which will inform your review and will guide your judgment as to whether you (on behalf of the Attorney General) will approve the modification of the decree. The EPA Implementation Manual describes the test to be used.

> In determining what are insignificant deviations, the agency should consider the extent of the delay, the nature of the violation, the good faith of the company, and the extent to which the delay impacts other provisions of the decree.

Manual, Ex. G., at 2. We assume this involves determinations of issues such as whether a violation is temporary or, if easily curable, likely to be cured because of the company's good faith willingness or effort to cure. However, "[w]here emissions limits are in issue, these cannot be viewed as 'de minimis' unless they cause no significant increase in emissions from a source." *Id.* at 1.

---

[9] *See also Industrial Union Dept.* v. *American Petroleum Institute,* 448 U.S. 607, 664 (1980) (Burger, J., concurring) ("insignificant," "scant or minimal risks"); *Hunter* v. *Madison Ave. Corp.,* 174 F.2d 164, 167 (6th Cir. 1949) ("inconsequential").

## III. The Role of § 113(e)(1)(E) and De Minimis Under the Act

The Administrator should make every effort to give effect to Congress' desire to afford economic relief to the steel industry so that it can devote capital resources to modernization. The Act, however, expressly and unequivocally conditions the companies' eligibility for an extension of the time deadlines under the Clean Air Act on the Administrator's making of two crucial findings: no "degradation of air quality," (§ 113(e)(1)(F)), and no extensions unless a company is "in compliance with existing Federal judicial decrees (if any) . . . [or] any violations of such decrees are de minim[i]s in nature." (§ 113(e)(1)(E)). If the Administrator cannot reasonably make such findings, the Act simply does not allow an exercise of discretion that ignores the Act's language in an attempt to maximize the number of steel companies eligible for relief. Compliance with the pollution control schedules contained in the consent decrees is just as integral a part of the Act as the desire to allow diversion of capital from air pollution equipment to improvements in plant efficiency.

Congress clearly contemplated, based in substantial part on the testimony of representatives of the steel industry, that compliance with existing decrees was a condition which was acceptable to the industry and attainable by it. While the provision was being fully debated by the committee that drafted the statute and the Congress that passed it, there was no indication that the steel companies could not or would not comply. In fact, on March 3, 1981, the EPA testified that most of the steel companies would be in compliance with their respective consent decrees by the end of the year.

> The steel industry used to have a fairly well-deserved reputation as a major polluter of air and water. However, that situation has now changed very much for the better. Where in July 1978 only 32 percent of air pollution sources in the steel industry were in compliance or on court-ordered compliance schedules, by the end of this year that number will be up to approximately 90 percent.

*Hearings on S. 63, supra,* at 6 (statement of Walter C. Barber, Jr., Acting Administrator, EPA); *Hearings on H.R. 1817, supra,* at 88 (85%) (statement of Walter C. Barber, Jr.); *Tripartite Hearings, supra,* at 13 (84%) (statement of Michele B. Corash, General Counsel, EPA). Since the steel companies' representatives were present and made no objection to these figures,[10] Congress must have assumed that this condition could be met by most steel companies.

---

[10] The steel companies complained that because they *were* complying with their respective consent decrees, they would have no money left for modernization under the Act. *See* n 13 *infra.*

The necessity of complying with outstanding consent decrees was discussed during the floor debates [11] and the hearings.[12] The steel companies themselves expressly recognized that the failure to be in compliance with their respective consent decrees would bar them from relief under the Act and, therefore, that each day's delay in enacting the law reduced the value of the Act to them.

> If I might depart from the Chairman's questions briefly, the point we most want to make here today is that this issue requires *immediate* legislative action. Those companies who have existing consent decrees with the EPA are on a schedule of compliance which requires weekly and sometimes daily commitment of funds to meet the December 31, 1982 deadline. Failure to meet these increments of progress places us in technical violation of the consent agreements. *S. 63 states that an extension applicant must be in compliance with existing consent agreements.* [Emphasis added.] If we are to have any funds to defer for modernization, we must have this amendment now.

*Hearings on S. 63, supra,* at 47 (statement of George A. Stinson, Chairman of National Steel Corp.) (March 3, 1981). A few weeks later, the same speaker made the point again.

> The terms of the agreement, coupled with long leadtimes for construction, require us to commit the funds early in the agreement if we are to meet the 1982 completion dates. Some funds for engineering, for site clearance, and the like have already been expended, and within a very few weeks we will have to make major capital commitments which in many cases will be impossible to defer further.
>
> These commitments are spelled out in the judicial decree with specific dates for action, and failure to meet those dates puts us in technical violation of the agreement. *Any violation of the agreement would in turn make us ineligible under the provisions of H.R. 1817 if it becomes law.*
>
> For these reasons, we and others need this amendment very soon if it is to have any benefit toward a rapid modernization of the industry. Passage of the amendment later this year under the reauthorization of the Clean Air Act would be of very little, if any, benefit to the industry.

---

[11] 127 Cong. Rec ` H3750 (daily ed. June 26, 1981); *id.* at H2447 (daily ed. May 28, 1981).
[12] *Tripartite Hearings, supra,* at 18 (EPA), 27 (EPA); *Hearings on S. 63, supra,* at 91 (NRDC); *Hearings on H.R. 1817, supra,* at 132 (statement by Pres. Carter submitted by the White House for the record).

*Hearings on H.R. 1817, supra,* at 65 (emphasis added) (March 25, 1981).[13] David M. Roderick, Chairman of the United States Steel Corp., made the same point at the same hearings.

> The existence or prospects of the consent decrees, as I mentioned earlier, is what creates the urgent need for this legislation. . . . . Our willingness to enter into these agreements has created binding obligations to make capital commitments that I mentioned earlier. In order to comply with our consent decrees and make the milestone schedules which they contain, we must commit millions of dollars virtually every month. Once these funds are committed, they are no longer available to be considered for stretchout, and we lose the opportunities to use these funds in the interim for modernization.

*Id.* at 70.

The Administrator's flexibility in interpreting the Act is limited by the fact that any modification to any consent decree issued pursuant to the terms of the Act must be approved by the judge in whose court the prior consent decree was approved. Act, § 113(e)(7)(B)(ii). Information (unless confidential) used to make the decision and the decision itself will be matters of public record. *Id.* § 113(e) (3), (7). The right of private parties or states to intervene under § 304 of the Clean Air Act, 42 U.S.C. § 7604 (Supp. IV 1980) for violation of emission standards remains available, § 113(e)(8); H.R. Rep. No. 121, *supra,* at 13, and would no doubt be exercised if such litigants felt that there had been an abuse of discretion by the Administrator in consenting to an extension where the de minimis finding was not defensible. *United States* v. *Republic Steel Corp.,* 15 Env't Rep. (BNA) 1463 (N.D. Ill. 1980); Fed. R. Civ. P. 24. Evaluation of whether a violation is de minimis, there-

---

[13] The steel companies were obliged to meet schedules in their consent decrees premised on a complete cleanup by December 1982. The race to get the Act passed before all the money was committed to compliance as mandated by consent decrees is illustrated in the following exchange between Rep. Waxman and Mr Stinson, Chairman of National Steel Corp., and Mr. Roderick, Chairman of United States Steel Corp.

> *Mr. Waxman.* Mr. Roderick and Mr. Stinson, when is the latest possible date for passage of this legislation to be valuable to the industry?
>
> *Mr. Stinson.* Well, every additional day, Mr Chairman, poses a problem for us. It is quite difficult for me to say whether it is March 31 or April 30, but I could definitely say to you that if it were delayed into the late summer, it would be of virtually no benefit to us.
>
> *Mr. Roderick.* . . . [E]ach month of delay would mean basically about $15 million to $20 million that otherwise would be available for modernization would have to go to environmental commitments, and if by July we didn't have even the EPA approval by that time, we would pretty well have run the gamut, we would have pretty well have had to commit on almost all the facilities in order to make the 1982 deadline. So I would say legislatively, Mr. Chairman, we would hope that it would be possible to have this legislation sometime no later than the end of April, allowing us time to make our presentations to the EPA and satisfy their requirements so that we would not have to commit, let's say, after July.

*Hearings on H.R. 1817, supra,* at 90. The Act did not become law until July 17, 1981

fore, is not a matter analogous to the exercise of prosecutorial discretion—it is an administrative decision that will be reviewed by the courts and critiqued by highly interested advocates. Unless supported by a cogent rationale, a finding that a violation is de minimis is likely to be rejected.

## IV. Arguments in Favor of a Broader Meaning of De Minimis

We have evaluated several potential arguments that might be advanced to support a broader meaning of de minimis, but they appear to be unsupported by the traditional meaning of the term or the Act's legislative history.

A. We have considered whether de minimis might be measured against a particular company's entire pollution control program or its compliance rate with all of its consent decrees, rather than measured against its operations at a particular plant. We do not believe that it may. The Act was an attempt to balance the steel industry's need for extensions so that it could devote capital resources to modernization against the continuing interest of the public in cleaner air. Exceptions under the Act were to be carefully scrutinized to ensure that all the conditions were met. "The bill does not authorize the granting of extensions on a blanket basis. Each request for an extension with respect to a specific emission control requirement and facility is to be considered individually." S. Rep. No. 133, *supra*, at 1. The emphasis appears to have been placed quite intentionally on individual stationary sources. In fact, rather than a violation at one plant being viewed as de minimis because of compliance at 99% of the company's other plants, the drafters apparently contemplated that a violation at one plant would preclude the granting of an exception even for the 99% of that company's plants that are in compliance.

> The owner of a *source* which is in violation of an emission limitation after a compliance deadline in an existing decree is not eligible for a compliance extension beyond 1982 for *any source* which would otherwise be eligible until *the* violating *source* is brought into compliance with the applicable emission limitation.

*Id.* at 4 (emphasis added).[14] We therefore do not believe that determination of whether a violation is de minimis should be made in the context of a company's entire compliance program.

---

[14] This understanding is reflected in a recent letter from the United States Steel Corp. to the EPA. "[T]he Act appears to contemplate that the Administrator may make a finding related to only one of the applicant's sources which leads to a decision that the applicant is ineligible under the Act, and that the ineligibility then applies to all of applicant's sources." Letter from Ms. Dorothy H. Servis, Senior General Attorney, Environmental and Real Estate, United States Steel Corp., to Mr. Michael Alushin, Director, Steel Tripartite Task Force, EPA at 2 (Oct. 23, 1981).

Moreover, this interpretation of de minimis would lead to an inconsistent and unequal application of the de minimis standard. The same violation would be a de minimis violation for a large company with many plants but a substantial violation for a small company with only a few plants. The larger the company, the more violations it could absorb and still obtain an exception. This construction would be particularly anomalous since the larger companies are also presumably generally better able to generate the capital necessary to eliminate violations. We therefore do not find support for the argument that whether a violation is de minimis should be measured against the total company compliance with the Clean Air Act or all of a particular company's outstanding decrees.[15]

B. We have also considered whether the Administrator could avoid the issue of whether or not a violation is de minimis by agreeing to modifications of the existing consent decrees to remove the requirements that give rise to the violations. We believe that the Act does not authorize such a procedure. Not only would this create a major loophole that would permit the Administrator effectively to eliminate § 113(e)(1)(E) from the Act, but it would also contradict the Act's language and the repeated statements by all parties assuring Congress that the steel companies knew they had to be in compliance and would be in compliance with their consent decrees. Most importantly, it would contradict the clearly expressed desire of Congress that only companies that had made the effort and expended the funds necessary to comply with their outstanding consent decrees were entitled to this exception. "[E]xisting decrees may not be amended so as to make companies eligible for extensions under this proposal." H.R. Rep. No. 121, *supra,* at 10. Congress foresaw and precluded this argument.

C. The same response must be made to the suggestion that the Administrator commence contempt actions against the violators and then settle the actions, collect outstanding stipulated penalties, and substitute new compliance schedules. Substitution of new compliance schedules would effectively amend existing consent decrees, contrary to the letter and spirit of the House report. It would permit companies that had failed to abide by their consent decrees access to the benefits of the Act. Since we believe that Congress clearly intended that such

---

[15] A similar argument was rejected in an early case discussing de minimis, *NLRB* v. *Cowell Portland Cement Co.,* 108 F.2d 198 (9th Cir. 1939), in which the issue was whether a company was doing enough interstate business to fall within the NLRB's jurisdiction.

> The quantity of cement shipped out of state is not de minimis merely because it is but a small percentage of respondent's total sales Otherwise, we would have the anomaly of one plant under federal regulation because exporting its entire product of 14,000 barrels while alongside it another competing plant was under state regulation because, though shipping the same amount of 14,000 barrels, they constituted, say, but 4 percent of its product. Congress could not have intended that it would subject laboring men or employers to such a confusing and, in business competition, such a destructive anomaly.

*Id.* at 201

companies be barred from an extension under the Act, we do not believe the Administrator may interpret the Act to permit such substitution of new compliance schedules.

We believe that de minimis means what it has traditionally meant—an insignificant or insubstantial matter. Where the violation of a consent decree cannot reasonably be described as insignificant, we do not believe that the Administrator can properly authorize an extension under the Act.

## V. Conclusion

We have not attempted to determine whether any particular company is or is not in violation of its consent decrees or, if the facts support a finding that there is a violation, whether that violation is de minimis. That would require a factual determination which we are not qualified to make and must be made, subject to your approval, by the Administrator. Each applicant, as noted earlier, has the burden of establishing that it is in compliance with the consent decrees or that its violations are de minimis.

The normal meaning of the term de minimis is entirely consistent with the Act's legislative history. Indeed, all of the legislative history on the subject supports that conclusion and none of it supports a more expansive definition. Since the EPA and the steel industry and Congress all seemed to believe that nearly all of the steel companies would be in compliance with their consent decrees, the Act did not contemplate any substantial deviations from the consent decrees. We have no way of determining whether Congress would have voted for the Act at all if the information had established that the companies were not then substantially in compliance or capable of placing themselves into such a status. We certainly cannot attribute to Congress an intent to allow the EPA Administrator to ignore or deviate in any material way from one of the integral components of the Act.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*